# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Robrock v. County of Piatt, 2012 IL App (4th) 110590**

---

| | |
|---|---|
| Appellate Court Caption | RICHARD B. ROBROCK II, Plaintiff-Appellee, v. THE COUNTY OF PIATT, ILLINOIS; SCOTT T. GAITROS; and BRENDA J. GAITROS, Defendants-Appellants. |
| District & No. | Fourth District<br>Docket Nos. 4-11-0590, 4-11-0591 cons. |
| Argued | January 24, 2012 |
| Rule 23 Order filed | February 15, 2012 |
| Rule 23 Order withdrawn | April 2, 2012 |
| Opinion filed | February 15, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action challenging defendant county's grant of defendant landowners' application for a special-use permit for a restricted landing area to accommodate the operation of their gyrocopter, the appellate court affirmed the trial court's finding that the grant of the permit was arbitrary and bore no real or substantial relation to the public health, safety, morals, comfort and welfare of the public as applied to plaintiff's neighboring property, but the entry of a permanent injunction against the submission of another application for a permit as to any of the 435.05 acres owned by plaintiffs was overbroad and the injunction was remanded for modification to include only the 79.5 acres on which the landing area was located. |
| Decision Under Review | Appeal from the Circuit Court of Piatt County, No. 09-MR-9; the Hon. Chris E. Freese, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed in part and reversed in part; cause remanded with directions. |
| Counsel on Appeal | Dana Rhoades (argued), State's Attorney, of Monticello, for appellant County of Piatt. |
| | Rochelle A. Funderburg (argued), of Meyer Capel, P.C., of Champaign, for appellants Scott T. Gaitros and Brenda Gaitros. |
| | Glenn A. Stanko (argued), of Rawles, O'Byrne, Stanko, Kepley & Jefferson, P.C., of Champaign, for appellee. |
| Panel | PRESIDING JUSTICE TURNER delivered the judgment of the court, with opinion. |
| | Justices Pope and Knecht concurred in the judgment and opinion. |

**OPINION**

¶ 1      In March 2009, defendants, Scott T. Gaitros and Brenda J. Gaitros, submitted a special-use permit application to defendant, County of Piatt (County), for a restricted landing area (RLA) on their property. In May 2009, the Piatt County board passed an ordinance granting the special-use permit. In July 2009, plaintiff, Richard B. Robrock II, filed a complaint for *de novo* review and for declaratory and injunctive relief. In May 2011, the trial court found in favor of plaintiff, found the ordinance unconstitutional, and entered a permanent injunction against defendants.

¶ 2      On appeal, defendants argue the trial court erred in (1) finding the special-use permit was arbitrary and (2) entering a permanent injunction against defendants. We affirm in part, reverse in part, and remand with directions.

¶ 3                         I. BACKGROUND

¶ 4      On April 7, 2008, the Gaitroses submitted an application to the County for a special-use permit for a restricted limited-access grass airstrip, measuring 100 feet wide and 2,400 feet long, on their property zoned as agriculture. The affected property amounted to 5.5 acres out of a 79.5-acre tract. The airstrip would allow takeoffs and landings of the Gaitroses' "personal gyrocopter."

¶ 5      A gyrocopter, or gyroplane, is classified as an experimental aircraft that is sold as a kit. Once built, it must receive a certificate of air worthiness from the Federal Aviation Administration. A gyroplane has one or two seats, an open cockpit, and an uncovered

gasoline aircraft engine with a muffler. It has a rotor on top similar to a helicopter and a propeller behind the pilot. Except on takeoff, the rotor is not powered by the engine and it helps keep the gyroplane elevated. Gyroplanes cannot hover like a helicopter. The propeller is powered during normal flight. A gyroplane typically flies at an altitude of 600 to 1,000 feet, although it might fly higher on long-distance trips.

¶ 6      Section 8 of the Illinois Aeronautics Act indicates a " 'restricted landing area' means any area of land, water, or both, which is used or is made available for the landing and takeoff of aircraft, the use of which shall, except in case of emergency, be only as provided from time to time by the [Illinois Department of Transportation]." 620 ILCS 5/8 (West 2008). According to sections 14.720 and 14.Appendix E, illustrations A and B, of title 92 of the Illinois Administrative Code (92 Ill. Adm. Code 14.720, 14.Appendix E (2012)), a proposed RLA cannot be approved unless it provides one or more landing strips or runways each of which shall be at least 1,600 feet in length (15:1 approach slope) and at least 100 feet in width (4:1 transition slope). A clear approach area must extend for 3,000 feet from the end of the runway so aircraft may clear the highest obstruction and land at the threshold of the runway.

¶ 7      An RLA is a private-use restricted facility. It is for the private use of one person having no more than six aircraft. No commercial operations are allowed. There are approximately 480 RLAs in Illinois, with seven located in Piatt County.

¶ 8      On May 13, 2008, the Piatt County Zoning Board of Appeals passed an ordinance granting the Gaitroses' application for a special-use permit. On May 16, 2008, the Gaitroses filed a second application for a special-use permit for a restricted limited-access grass airstrip on the 79.5-acre tract. The second application was not limited to "personal gyrocopter use."

¶ 9      On September 25, 2008, the Piatt County Zoning Board of Appeals, over plaintiff's objection, voted 4 to 1 to recommend approval of the Gaitroses' special-use permit application but failed to achieve the five votes necessary for approval. On October 14, 2008, the Piatt County State's Attorney opined that no special-use permit was required for an RLA. Based on that opinion, the Gaitroses withdrew their second application.

¶ 10      In November 2008, plaintiff filed a complaint for *mandamus* against the County, seeking to compel the County to enforce its zoning ordinance and to require the Gaitroses to obtain a special-use permit for the RLA. On March 16, 2009, the trial court directed the County to enforce its zoning ordinance and to require the Gaitroses to apply for a special-use permit.

¶ 11      On March 23, 2009, the Gaitroses filed an application for their third special-use permit for an RLA on their property. On May 12, 2009, the county board approved the special-use permit allowing the RLA on the Gaitroses' property.

¶ 12      In July 2009, plaintiff filed a complaint for *de novo* judicial review pursuant to section 5-12012.1 of the Counties Code (55 ILCS 5/5-12012.1 (West 2008)) and for declaratory and injunctive relief. Plaintiff contended the presence of the RLA had caused a reduction in the fair market value of his property, the noise impacts plaintiff's wildlife preserve, and he and his wife both have hearing conditions that require them to avoid loud noise. Plaintiff argued the special-use permit granted to the Gaitroses is arbitrary and bears no real and substantial relation to the public health, safety, morals, comfort, and general welfare, and, therefore, is

unconstitutional as applied to plaintiff's property. Plaintiff asked that the ordinance granting the special-use permit be declared void and further use of the Gaitroses' property for RLA purposes should be enjoined.

¶ 13    In September 2009, the Gaitroses filed a motion to dismiss plaintiff's complaint. In November 2009, the trial court denied the motion to dismiss.

¶ 14    In May 2011, the trial court held a trial on plaintiff's complaint. Called as an adverse witness, Scott Gaitros testified he owns approximately 500 acres in Cerro Gordo with about 160 acres used for farming. An 80-acre tract to the south of the Gaitros home contains the RLA, which runs from the southwest to the northeast. Illinois Route 32, which runs north and south, borders the east side of the Gaitros property. To the northeast of the Gaitroses' home sits plaintiff's property.

¶ 15    Gaitros testified he stored his gyroplane at the Decatur airport until the RLA was finished. He agreed the Decatur airport was less than 20 miles from his house and the Monticello airport was approximately 12 to 13 miles from his house. Gaitros stated he sought to use his RLA for "fly-ins," where friends would fly in. There is another RLA approximately three miles north of the Gaitroses' property. Gaitros stated he had taken off and landed over the tree line and power lines near his property and flown over plaintiff's cornfield. Gaitros planned to store his gyroplane in a barn on his property.

¶ 16    Plaintiff presented the evidence deposition of appraiser John Scott regarding the value of plaintiff's land given the nearby RLA. Scott, an emeritus professor of land economics and farm management at the University of Illinois, stated he had been doing real-estate appraisals for more than 50 years. In making his appraisal, Scott looked at plaintiff's property and surrounding areas. He stated approximately 94 acres of the property were suitable for development as they are along the Sangamon River. A 60-acre tract and a 166-acre tract were best suitable for agriculture. Scott valued the farmland at $5,000 per acre and the development land at $10,000 per acre.

¶ 17    Scott then considered the effect of the Gaitroses' RLA on plaintiff's property. He opined the development value would drop by half to $5,000 per acre because "there would be fewer people that would be desirable of building in that area knowing that the flight path of these aircraft [is] going to be over that property." He stated the diminution in value is present regardless of the frequency of the gyroplane flights. He also reduced the value of the farmland by 50%. The total decrease in value of plaintiff's property was estimated at $664,060.

¶ 18    On examination by Gaitroses' counsel, Scott stated the material he relied on regarding noise was not specific to gyroplanes. He admitted the immediate impact area of the RLA was not above any of the 94 acres to be developed. Although Scott estimated the noise level at the farmstead to be 75 decibels, he had no information to support that conclusion other than the information he received from plaintiff.

¶ 19    Plaintiff testified his property consists of 322 acres. He and his wife have developed a wildlife preserve on the property, which included acres of timber, savannah, tall grass prairie, and a pond. In terms of development, plaintiff hoped to build one house per year. Plaintiff has observed several takeoffs and landings of the Gaitroses' gyroplanes. He stated "an hour

in that gyro is like thirty airplanes taking off, because you have this continual Harley Davidson buzzing around in the sky for an hour or two." When the gyroplane takes off to the northeast, it comes across plaintiff's property at 40 feet "and flies wherever it wants to go." He once saw it fly two feet over his bean field at a time "the bean pods [were] extremely fragile." He has also observed the gyroplane flying over the development area. Plaintiff stated he has a "hearing problem," which he called "ringing tinnitus," and wears hearing aids to help it. When using equipment, he wears ear plugs and a headset. Even with the ear plugs, headset, and a mower engine, he can still hear the gyroplane. He once saw a gyroplane doing "figure 8s, S-turns and so on, over in the vicinity of the power line." He estimated the trees along the west side of the Gaitros property to be between 30 and 40 feet high and the power lines to be 30 feet. Plaintiff estimated the gyroplane would be about 40 feet off the ground when it passes over the trees and power lines.

¶ 20    Ellen Robrock testified she has observed gyroplanes flying over her property between 100 and 150 times. She stated she is "partially deaf due to a severe hearing loss on the right side." She takes steps to protect the hearing in her left ear by wearing headsets and ear plugs both inside and outside. She described the gyroplane as being "loud."

¶ 21    Jeremy Crouch, a real-estate appraiser, testified he was asked to perform a review appraisal of the work performed by John Scott on the Robrock property. Crouch found "a number of errors" in Scott's analysis as it related to highest and best use. Crouch found the highest and best use of the north 94 acres is agricultural for crop production and not development properties considering the poor economic conditions. Crouch also stated the County zoning ordinances limited the size of the lots to 20 acres unless it was rezoned.

¶ 22    On cross-examination, Crouch acknowledged the County allowed for residential development of tracts as small as five acres as a special use in the agricultural zone. Crouch had never appraised land bordering an RLA. In response to questions from the trial court, Crouch agreed there could be a noticeable difference in value of property if the property was next to an airport with aircraft taking off and landing every week.

¶ 23    Over plaintiff's objection, Mark Rubel, an instructor and audio director at Eastern Illinois University, testified as an expert on sound pressure levels. He measured the sound level in front of plaintiff's house while Gaitros flew his gyroplane on October 15, 2010. While the gyroplane was approximately a quarter mile away, it registered 74 decibels. On October 17, 2010, the closest the gyroplane came to Rubel was less than one-eighth of a mile away. The maximum measurement was 75.6 decibels.

¶ 24    On cross-examination, Rubel testified the gyroplane never flew directly above him. Rubel did not have any information about the speed of the gyroplane, its altitude, or the wind speed when he took his measurements.

¶ 25    Steve Long, acting chief engineer for the Illinois Department of Transportation (IDOT), Division of Aeronautics, testified the Gaitroses requested an application for a certificate of approval for an RLA. Long stated the Gaitroses' RLA met IDOT standards. He stated the length of the runway was 1,670 feet, although the original application had it at 2,400 feet. The width was 100 feet. Long stated the power poles and trees near the Gaitros property fell below the approach surface. The controlling obstruction, an ash tree in the midline of the

runway, ended up being 21:1, while a power pole, the next controlling obstruction was 22:1.

¶ 26    On cross-examination, Long stated the 3,000-foot clear approach on the northeast end of the runway extends over plaintiff's property. No obstructions are to break the plane of the approach. If they do, "something has to be done to the RLA." If plaintiff wanted to build something that would penetrate the plane, the zoning authority would have to take into account that it would interfere with the Gaitroses' RLA.

¶ 27    Following closing arguments, the trial court issued its oral ruling. The court stated it had "never seen a case more one-sided than this one" and ruled in favor of plaintiff. The court found the RLA was arbitrary, bore "no real and substantial relation to the public health, safety, morals, comfort and welfare and/or [was] unrelated to the health, safety, morals, comfort and welfare as applied to plaintiff's property." The court found the ordinance granting the special-use permit was unconstitutional and invalid as applied to plaintiff's property. The court also entered a permanent injunction enjoining and restraining the Gaitroses from using their property for RLA purposes, from using their property to take off and land aircraft of any kind, and from seeking another special permit application for RLA use. This appeal followed.

¶ 28                                II. ANALYSIS
¶ 29                            A. Zoning Ordinance
¶ 30    Defendants argue the trial court erred in finding the special-use permit ordinance was arbitrary and unrelated to the public health, safety, morals, and comfort. We disagree.

¶ 31                    1. *Zoning Challenges and Standard of Review*
¶ 32    Zoning issues primarily involve legislative functions, "and it is within the province of local governmental bodies to determine the use of land and to establish zoning classifications." *Twigg v. County of Will*, 255 Ill. App. 3d 490, 493, 627 N.E.2d 742, 744 (1994). "A zoning ordinance may be valid in general, but invalid as to a particular piece of property." *Glenview State Bank v. Village of Deerfield*, 213 Ill. App. 3d 747, 759, 572 N.E.2d 399, 408 (1991). "The party challenging the zoning bears the burden of proving by clear and convincing evidence that the application of the ordinance to the property is unreasonable and arbitrary and bears no substantial relation to public health, safety, morals, or welfare." *Northern Trust Bank/Lake Forest, N.A. v. County of Lake*, 311 Ill. App. 3d 332, 336, 723 N.E.2d 1269, 1274 (2000); see also *Wakeland v. City of Urbana*, 333 Ill. App. 3d 1131, 1139, 776 N.E.2d 1194, 1202 (2002) ("To ensure that it does not invade that legislative prerogative, the trial court should require the plaintiff to prove, by clear and convincing evidence, that the zoning restrictions 'bear no real and substantial relation to the public health, safety, morals, comfort[,] and general welfare.' [Citation.]").

¶ 33    In a zoning case, "[t]he trier of fact is in the better position to assess the credibility of the witnesses and their opinions." *Twigg*, 255 Ill. App. 3d at 493, 627 N.E.2d at 745. The trial court's findings will not be overturned on appeal unless against the manifest weight of the evidence. *Furniture L.L.C. v. City of Chicago*, 353 Ill. App. 3d 433, 437, 818 N.E.2d 839,

843 (2004). " '[A]gainst the manifest weight of the evidence' means that the opposite conclusion is clearly evident from the evidence in the record–in other words, there was plain, clear, and undisputable error in the factual findings." *Wakeland*, 333 Ill. App. 3d at 1139, 776 N.E.2d at 1202.

¶ 34                                  2. *La Salle Factors*

¶ 35        Our supreme court has noted "[a] zoning ordinance is presumptively valid." *La Salle National Bank of Chicago v. County of Cook*, 12 Ill. 2d 40, 46, 145 N.E.2d 65, 69 (1957). However, the court has also stated that "if the restrictions imposed bear no real and substantial relation to the public health, safety, morals, comfort and general welfare, the ordinance is void." *La Salle*, 12 Ill. 2d at 46, 145 N.E.2d at 69. In determining whether an ordinance is valid, the *La Salle* court set forth the following six factors to consider, including:

> "(1) The existing uses and zoning of nearby property [citations], (2) the extent to which property values are diminished by the particular zoning restrictions [citations], (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public [citations], (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner [citations], (5) the suitability of the subject property for the zoned purposes *** [citations], and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property." *La Salle*, 12 Ill. 2d at 46-47, 145 N.E.2d at 69.

The court stated "[n]o one factor is controlling." *La Salle*, 12 Ill. 2d at 47, 145 N.E.2d at 69. Moreover, "[w]hen it is shown that no reasonable basis of public welfare requires the limitation or restriction and resulting loss, the ordinance fails and the presumption of validity is dissipated." *La Salle*, 12 Ill. 2d at 47-48, 145 N.E.2d at 69.

¶ 36                         a. Uses and Zoning of Nearby Property

¶ 37        Courts have found the first factor to be "of paramount importance." *Northern Trust Bank*, 311 Ill. App. 3d at 337, 723 N.E.2d at 1274; *Twigg*, 255 Ill. App. 3d at 494, 627 N.E.2d at 745. The vast majority of land around the Gaitroses' RLA is either zoned agricultural (A-1) or conservation (AC). The surrounding uses are consistent with the zoning–pastures, row crops, timber, and a river. The Norfleet RLA is 2½ miles away and is used for crop-dusting purposes. The general uniformity of uses and zoning in this rural area, coupled with the nearby Norfleet RLA, make this factor a major negative when it comes to putting an RLA on the Gaitros property. This factor weighs in favor of plaintiff.

¶ 38                      b. Diminishment of Plaintiff's Property Value

¶ 39        As to the second factor, plaintiff relied on the appraisal of his expert John Scott. He stated approximately 94 acres of the property were suitable for development as they are along the Sangamon River. A 60-acre tract and a 166-acre tract were best suitable for agriculture.

Scott valued the farmland at $5,000 per acre and the development land at $10,000 per acre.

¶ 40   Scott also considered the effect of the RLA on plaintiff's property. He opined the development value would drop by half to $5,000 per acre because "there would be fewer people that would be desirable of building in that area knowing that the flight path of these aircraft [is] going to be over that property." He stated the diminution in value is present regardless of the frequency of the gyroplane flights. He also reduced the value of the farmland by 50%. The total decrease in value of plaintiff's property was estimated at $664,000.

¶ 41   Defendants' expert, Jeremy Crouch, disagreed with Scott's appraisal. He found the highest and best use of the 94 acres is agricultural for crop production and not development properties considering the poor economic conditions.

¶ 42   In this case, the trial court heard conflicting testimony regarding the value of plaintiff's property and the alleged diminution of value considering the presence of the RLA. In such circumstances, "[t]he trial judge is in the best position to resolve any such conflicts, observe the witnesses' demeanor and determine their credibility." *City of Marseilles v. Radke*, 307 Ill. App. 3d 972, 977, 718 N.E.2d 1052, 1056 (1999). Moreover, "[a]s the trier of fact, the judge may accept one expert opinion over another." *Radke*, 307 Ill. App. 3d at 977, 718 N.E.2d at 1056.

¶ 43   The trial court had ample amounts of evidence to determine whether plaintiff's property value would be diminished by the presence of the Gaitroses' RLA, and it is "the trial court's prerogative to decide how much weight to give to it." *Wakeland*, 333 Ill. App. 3d at 1141, 776 N.E.2d at 1203. This factor weighs in favor of plaintiff.

¶ 44             c. Extent to Which the Devaluation Promotes the Public Good

¶ 45   As to the third factor, nothing in the evidence or testimony suggests the existence of the Gaitroses' RLA would benefit the public. The purpose of the RLA is for the private recreational use of Scott Gaitros and his gyroplane as well as any friends he invites to fly in. This factor favors plaintiff.

¶ 46             d. Relative Gain to the Public Compared With Hardship to Plaintiff

¶ 47   Similarly to the third factor, the fourth factor favors plaintiff. The fourth factor is essentially "a balancing test." *Glenview State Bank*, 213 Ill. App. 3d at 763, 572 N.E.2d at 410. As discussed in the preceding factor, an RLA on the Gaitros property does not promote the health, safety, or general welfare of the public and, thus, represents no relative gain to the public. Moreover, the evidence indicated the presence of the RLA represented a considerable hardship to plaintiff. Scott testified to the significant diminution in value to plaintiff's property. Also, the noise from the gyroplanes poses a threat to the health of plaintiff and his wife, who both suffer from hearing problems and wear ear protection to preserve what hearing they have left.

¶ 48   Another possible hardship is placed on plaintiff because his property bears the burden of the 3,000-foot approach area on the northeast end of the RLA. Long stated no obstructions

are to break the plane of the approach. He stated that if plaintiff wanted to build a structure on his property that would penetrate the plane, the zoning authority would have to take into account that it would interfere with the Gaitroses' RLA.

¶ 49    e. Suitability of the Property to the Zoned Purposes

¶ 50    The fifth factor also favors plaintiff. Prior to the RLA, the five-acre tract was clearly suited for agricultural purposes. It was taken out of crop production for the RLA, while the remainder of the 80 acres is devoted to row crops. Although the length and width of the ground, along with its apparent flatness, make it suitable for an RLA, the suitability is outweighed by the minuscule gain to the public and the promotion of the health, safety, and general welfare.

¶ 51    f. Length of Time the Subject Property Has Been Vacant

¶ 52    As to the sixth factor, the property on which the RLA was located was not vacant prior to the special-use permit application. As such, we do not consider it in our analysis.

¶ 53    3. *Sinclair Factors*

¶ 54    In *Sinclair Pipe Line Co. v. Village of Richton Park*, 19 Ill. 2d 370, 167 N.E.2d 406 (1960), our supreme court added two other factors for courts to consider in determining the validity of an ordinance. Those factors look at (1) the community's need for the proposed use and (2) the care with which the community has planned its land use and development. *Sinclair*, 19 Ill. 2d at 378, 167 N.E.2d at 411.

¶ 55    a. Community Need for More of the Proposed Use

¶ 56    In the case *sub judice*, the evidence showed little community need for the proposed RLA. The Monticello airport is within a 12- to 13-mile drive of the Gaitros residence, and the Decatur airport is approximately 17 miles away. Scott Gaitros even used the Decatur airport to store his gyroplane prior to the RLA becoming operational. The evidence also showed the only people using the Gaitroses' RLA would be Gaitros and some of his fellow gyroplane enthusiasts who might fly in for a short period of time. This factor weighs in favor of plaintiff.

¶ 57    b. Care With Which the County Has Planned Its Land Use

¶ 58    The 1970 Piatt County comprehensive plan was in effect when the Gaitroses' special-use permit was granted. "[P]rotection of natural resource areas such as game preserves, woodlands, rivers and streams, and protection of the rural countryside as a whole" was one of the "land use problems" identified in the plan. See A Comprehensive Plan for Piatt County, Illinois, at 72 (May 1970) (prepared for Piatt County Regional Planning Commission by Harland Bartholomew and Associates, Planning, Engineering, Landscape Architecture, Urban Renewal, St. Louis, Missouri). The control of land use was necessary for the

protection of the rural areas.

¶ 59    In addition to the Piatt County airport in Monticello, the comprehensive plan identified 12 airports in the regional area, including Champaign and Decatur. Because of the close proximity of these facilities, the plan found no need to provide similar improvements within Piatt County. The plan also concluded the airport near Monticello would be more than adequate to handle local flight operations.

¶ 60    The evidence in this case indicates placing another RLA in the rural farm fields of Piatt County is not in harmony with the comprehensive plan. Moreover, the creation of another airstrip in rural Piatt County, when other airports are available in close proximity, is not in harmony with the comprehensive plan. This factor weighs in favor of plaintiff.

¶ 61    In reviewing the evidence in this case, the *La Salle* and *Sinclair* factors weigh in plaintiff's favor. The trial court found the special-use permit for the RLA was arbitrary and bore no real and substantial relation to the public health, safety, morals, comfort, and welfare of the public as applied to plaintiff's property. We find the court's decision was not against the manifest weight of the evidence.

¶ 62                              B. Permanent Injunction

¶ 63    Defendants argue the trial court abused its discretion by entering a permanent injunction enjoining the Gaitroses from submitting and the County from considering another special-use permit for a RLA on the Gaitros property. We agree in part.

¶ 64    "In order to be entitled to a permanent injunction, the party seeking the injunction must demonstrate: (1) a clear and ascertainable right in need of protection; (2) that he or she will suffer irreparable harm if the injunction is not granted, and (3) that there is no adequate remedy at law." *Kopchar v. City of Chicago*, 395 Ill. App. 3d 762, 772, 919 N.E.2d 76, 85 (2009). On appeal, "the standard of review of a court order issuing a permanent injunction is manifest weight of the evidence." *O'Donnell v. City of Chicago*, 363 Ill. App. 3d 98, 104, 842 N.E.2d 208, 214 (2005). A trial court's judgment will be found to be against the manifest weight of the evidence "only if the opposite result is clearly evident." *Harper v. Missouri Pacific R.R. Co.*, 282 Ill. App. 3d 19, 25, 667 N.E.2d 1382, 1386 (1996).

¶ 65    The trial court entered a permanent injunction against the Gaitroses "from using the Gaitros property for RLA purposes." The court also enjoined the Gaitroses "from seeking another special use permit for RLA use on the Gaitros property" from the County. The County was enjoined from "further considering or issuing a special use permit application for RLA use with respect to the Gaitros property."

¶ 66    The Gaitroses argue the injunction is overly broad because it applies to all property owned by them, even property not adjacent to plaintiff's land. "An injunction should be reasonable and should only be as broad as is essential to safeguard the rights of the plaintiff." *Tsuetaki v. Novicky*, 158 Ill. App. 3d 505, 514, 509 N.E.2d 1019, 1026 (1983). Here, the trial court's order defined the Gaitroses' property as being 435.05 acres. However, the focus of this case centered on the 79.5 acres on which the RLA was located as well as plaintiff's neighboring land. It may be that the concerns regarding the clear approach could be alleviated if the RLA was located somewhere else on the Gaitroses' property. Whether a new RLA, if

-10-

feasible and permitted by the County, along with Scott's continued use of his gyroplane, will constitute a private nuisance is a matter not before us. We hold the permanent injunction as to the *entire* Gaitros property was overbroad. Accordingly, we reverse the permanent injunction and remand to the trial court to modify the injunction to include only the 79.5-acre tract on which the RLA at issue here was located.

¶ 67                                        III. CONCLUSION

¶ 68        For the reasons stated, we affirm in part, reverse in part, and remand with directions.

¶ 69        Affirmed in part and reversed in part; cause remanded with directions.