# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

***People v. Jenkins*, 2013 IL App (4th) 120628**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. DEARION J. JENKINS, Defendant-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-12-0628 |
| Filed | March 15, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A murder victim's statement to a police officer in his hospital recovery room following surgery for a gunshot wound was not admissible under the dying declaration exception to the hearsay rule, or the exception applicable to a statement made against a party who engaged in wrongdoing intended to procure the unavailability of the declarant as a witness, since there was no clear and indisputable evidence the victim believed his death was imminent when he talked to the officer and the shot was apparently fired to obtain the victim's wallet, not to procure his unavailability as a witness. |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 11-CF-1055; the Hon. Heidi N. Ladd, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
|---|---|
| | Michael J. Pelletier, Karen Munoz, and Colleen Morgan, all of State Appellate Defender's Office, of Springfield, for appellee. |
| Panel | JUSTICE APPLETON delivered the judgment of the court, with opinion. Justices Pope and Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Dearion J. Jenkins, was to be tried by a jury for allegedly murdering Cedric Mallett (720 ILCS 5/9-1(a)(3) (West 2010)). Immediately before jury selection was to begin, the trial court heard a motion *in limine* by defendant to exclude, as hearsay, three statements that Mallett had made to police officers after he was shot. The court denied the motion in part and granted it in part, holding the first two statements to be admissible and the third statement to be inadmissible. Instead of proceeding to trial, the State filed a certificate of impairment and a notice of appeal, seeking review of the trial court's exclusion of Mallet's third hearsay statement. See Ill. S. Ct. R. 604(a)(1) (eff. July 1, 2006); *People v. Drum*, 194 Ill. 2d 485, 490 (2000); *People v. Young*, 82 Ill. 2d 234, 247 (1980).

¶ 2    In ruling that the third statement was inadmissible, the trial court concluded it would be unreasonable to draw the factual inferences necessary to bring the statement within the hearsay exceptions the State had invoked, namely, the exception for dying declarations and the exception for forfeiture by wrongdoing. We do not find the trial court's factual determinations to be against the manifest weight of the evidence. Therefore, we affirm the decision to exclude Mallett's third hearsay statement.

¶ 3                                  I. BACKGROUND

¶ 4    The trial court heard defendant's motion *in limine* on June 26, 2012. According to the motion, a Champaign detective named Mark Strzesak went to Carle Hospital on July 5, 2011, immediately after Mallett was transported there to be treated for a gunshot wound. Strzesak questioned Mallett two times that day: at 3 a.m., as Mallett was being prepared for surgery, and at 11:45 a.m., after Mallett underwent surgery. The motion sought to exclude, as inadmissible hearsay, any statements or gestures Mallett made to Strzesak on those occasions. Defense counsel, Daniel C. Jackson, argued that the only possibly relevant exception to the hearsay rule was that for dying declarations, and he argued that the

statements did not come within the exception for dying declarations because there was no evidence that Mallett believed his death to be imminent. Jackson reasoned:

"Judge, there is clearly no indication the death was imminent in this. The victim was in recovery when he made the statements. It was a full day and a half before he passed away.

The officer, in fact, when he spoke to the defendant [*sic*] the second time in the recovery room, he told him that he was having a little trouble understanding him because the defendant's [*sic*] mouth was so dry and that he would come back in a day or so to talk to him later. So there is clearly no impression that the officer or the victim knew the death was imminent.

***

It is the burden of proof on the server, on the State, Judge, to prove beyond a reasonable doubt that that situation existed with this defendant. We would suggest to the court that the evidence will show or shows that it clearly wasn't, that the victim made statements well before he passed away, that neither he nor anyone talking to him told him that he was going to die or thought that that was even an imminent situation."

¶ 5     In response, the prosecutor, Dan Clifton, identified three occasions when Mallett made a hearsay statement to a police officer, and he argued that all three statements were admissible in evidence. Because the exact content of Clifton's offer of proof is important, we will quote him extensively:

"Your Honor, I would argue that the statements made by the victim were made at three different times under different circumstances and that each statement should be given individual consideration.

With regard to the now deceased victim's first statement, the evidence will be at 2:41 a.m., on July 5, 2011, Champaign Police Department Officer David Butler was dispatched to a shooting at 1110 Dorsey in Champaign. He arrived at that address three minutes later and found the now deceased victim Cedric Mallett slumped in a chair outside the front door of his apartment.

Mallett appeared to be going in and out of consciousness, was having difficulty breathing, and was bleeding from a gunshot wound to his back.

While waiting the arrival of an ambulance and paramedics, Officer Butler asked Mallett if he knew who shot him, and Mallett replied, 'Dearion. He took $20 from me.'

Officer Butler tried to ask Mallett additional questions, but he appeared to be physically unable to answer those questions.

With regard to the victim's second statement, the evidence will be that Mallett was transported by ambulance from 1110 Dorsey to the Emergency Department of Carle Hospital in Urbana.

Shortly thereafter Champaign Police Department Mark Strzesak, spoke to Mallett as medical personnel were rushing him from the emergency department to the operating room.

Mallett's apparent physical condition and the demeanor of the medical personnel

treating him caused Strzesak to be concerned that Mallett would not survive. He felt this might be his last opportunity to speak with Mallett. Strzesak observed that Mallett appeared to be in great pain.

Mallett agreed to look at photo lineup. The defendant's photo was not included in that lineup. Mallett told Strzesak that the person who shot him was not depicted in that lineup.

Strzesak asked Mallett if he knew who shot him, and Mallett replied that it was Dearion. He told Strzesak he didn't know Dearion's last name, but that Dearion's girlfriend lived on North Wood, three houses from McKinley on the left.

Strzesak was prevented from speaking further with Mallett by Mallett being taken into the operating room.

With regard to the victim's third statement, the evidence will be that at about noon on July 5, 2011, Detective Strzesak spoke with Mallett again at Carle Hospital. Mallett appeared to still be in great pain, was receiving medication, was attached by tubes to various medical devices, and his abdomen bore at [*sic*] diamond-shaped surgical dressing which measured approximately 18 inches by 12 inches, which Strzesak learned was covering a gaping incision remaining from treatment from Mallett's gunshot wound."

¶ 6 At that point, Clifton proffered to the trial court two photographs of Mallett in his hospital bed. These photographs are in the record, sealed by order of the trial court. We have unsealed them and then resealed them. In People's exhibit A, Mallett is lying on his back, naked. His eyes are closed. Intravenous tubes are attached to him. An oxygen tube is taped to his nose. A large oval-shaped dressing is taped to his abdomen, and a tube extends out of the dressing.

¶ 7 In the other photograph, People's exhibit B, all the tubes and dressings have been removed, and it is just Mallett, naked and lying on his back, with his eyes closed. He presumably is dead in this photograph. With the big oval-shaped dressing gone, the incision in his abdomen is now exposed to view. It is a large gaping incision that appears to be of the dimensions that Clifton described. Entrails bulge out of the incision.

¶ 8 Clifton continued:

"MR. CLIFTON: Your Honor, those photographs show the nature of the large incision that was made to the victim's abdomen exposing his viscera that was covered by the surgical dressing.

Again, on this occasion Detective Strzesak was concerned that Mallet might not survive, so he pressed on in his interview with Mallett despite his apparent pain and poor medical condition.

Mallett indicated that he remembered Strzesak from the earlier conversation. Mallett then picked the defendant out of a six-photo array and recounted that the defendant had approached him near his apartment wanting to buy a pack of cigarettes. After Mallett provided him with the cigarettes, the defendant began to walk away.

As Mallett began to turn around he was struck in the head with a fist. The defendant then tried to take his wallet and then pulled what appeared to be a black, 9-millimeter,

semiautomatic pistol from his waistband and shot [M]allet in the back.

After Mallet gave his statement, Strzesak was concerned enough about Mallett's condition that he believed he needed to end the interview so Mallett could rest. Despite his concerns about Mallett's prognosis, Strzesak told Mallett he would return and speak to him again when he was feeling better.

Strzesak never spoke with Mallett again. Mallett died at Carle Hospital approximately 48 hours after making this third statement."

¶ 9 Clifton argued that Mallet's first and second statements, namely, the statement he made to Butler at the crime scene and the statement he made to Strzesak as he was being wheeled into the operating room, were admissible as excited utterances and also as dying declarations. He argued that Mallet's third statement, namely, the statement he made to Strzesak after surgery, was admissible as a dying declaration. In addition, Clifton argued that all three statements were admissible under the exception for forfeiture by wrongdoing (the defendant's forfeiture of his or her right of confrontation, owing to wrongdoing by which the defendant intended to, and did, make the victim unavailable as a witness).

¶ 10 After taking a recess to review the authorities the State had submitted, the trial court ruled that Mallett's first statement was admissible both as a dying declaration and as an excited utterance and that his second statement was admissible only as an excited utterance. The court concluded, however, that the third statement fell within neither the exception for dying declarations nor the exception for excited utterances. The court reasoned as follows:

"With regards then to the third statement that was made postsurgery, at that point I have considered the nature of the injury, the fact that the detective was concerned is irrelevant unless his subjective concerns about Mr. Mallet were communicated to Mr. Mallett.

There is nothing in the State's proffer here that suggests that anything was communicated to Mr. Mallett so that he would perceive that he was on the cusp of death.

There has been no suggestion that the medical personnel would have communicated that to him or that his condition at that point would have circumstantially created that implication or fear in his mind.

And certainly nothing was communicated to him that has been represented here. In fact, he had survived the operation. While he may have been under a great deal of pain, still under the agitation and emotional distress that was inflicted, there is no suggestion that he had any belief at that point that he would not survive that surgery.

And I believe the point made here that the detective said he would return and speak to him again is a valid one suggesting in the declarant's mind, Mr. Mallett's, that this would be an ongoing interview and he would survive. So there is no evidence to suggest or support any suggestion that Mr. Mallett believed he would not survive at that point.

Likewise, there is nothing that falls within the exception of an excited utterance. A large amount of time and intervening circumstances had taken place. So I don't believe that statement where he identifies who shot him in the photo lineup would come up at all."

¶ 11    Next, the trial court addressed the exception for forfeiture by wrongdoing. The court reasoned:

> "With regards to the forfeiture by wrongdoing suggestion, that is Illinois Rule of Evidence 804(5)(a), that has to be an act that renders the witness unavailable but the act itself has to be committed with the intent to make the witness unavailable; otherwise, that would be a blanket exception for any homicide charged.

> It's clear from the cases that have interpreted that, that is not how that exception was designed. It was designed for that malfeasance that was directed intended to prevent a witness from testifying.

> So the intent of the act has to be specifically to prevent the witness from testifying, not an act that merely because of its result does prevent the witness from testifying. Here there is no evidence to suggest that the action was designed or intended to prevent Mr. Mallet from testifying, and so that forfeiture by wrongdoing exception does not apply to these circumstances."

¶ 12    Thus, the trial court ruled: "[T]he first statement would come in under the dying declaration and excited utterance. The second statement would come in under excited utterance but not dying declaration. The third statement, the one at noon on July 5, would not come in at all."

¶ 13    This appeal followed.


¶ 14                                          II. ANALYSIS

¶ 15                                    A. Our Standard of Review

¶ 16    Citing *People v. Aguilar*, 265 Ill. App. 3d 105, 109 (1994), the State suggests that we should decide *de novo* whether Mallett's third statement was admissible under the exception for dying declarations and under the exception for forfeiture by wrongdoing. *Aguilar* is different from this case, however, because, in *Aguilar*, the dispute was over the legal content of a hearsay exception–what the exception said–whereas, in the present case, the legal content of the hearsay exceptions is undisputed, and the only dispute is whether the trial court *had* to draw the factual inferences that would have brought the third statement within the hearsay exceptions.

¶ 17    In *Aguilar*, the trial court erroneously believed that, under the law, a hearsay statement by a defendant was admissible in evidence as an "admission" only if the statement was an admission that the defendant had committed a crime or only if it was an admission of an element of the charged offense. *Id.* at 109-10. The question on appeal, then, was purely a legal question regarding the content of the hearsay exception for admissions, a content determined solely by the common law: Did a hearsay statement by a defendant have to be inculpatory to be admissible as an admission? *Id.* at 110. The appellate court said: "The trial judge's decision was based on his interpretation of the admissions exception to the rule against hearsay. This case involves a legal issue and did not require the trial court to use its discretion regarding fact-finding or assessing the credibility of witnesses." *Id.* at 109. The appellate court decided, *de novo*, that the trial court was mistaken in its belief that an

-6-

admission had to be inculpatory. *Id.* at 110. According to case law, "[a]ny statement by an accused person, unless excluded by the privilege against self-incrimination or other exclusionary rules, [might] be used against him as an admission." *Id.*

¶ 18    In the present case, by contrast, the parties do not dispute what the hearsay exception for dying declarations says. Nor do they dispute what the exception for forfeiture by wrongdoing says. In other words, unlike *Aguilar*, this appeal presents no controversy over the interpretation of a hearsay exception. Instead, the controversy is essentially factual: Did the trial court have to infer that defendant believed his death was imminent when he made his third statement? See Ill. R. Evid. 804(b)(2) (eff. Jan. 1, 2011). And did the court have to infer that, when defendant shot Mallett (according to the offer of proof), he did so with the intent to procure Mallett's unavailability as a witness? See Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011).

¶ 19    Even if the external facts are undisputed, no one has direct access to another person's mind; one can only *infer*, from the external facts, what another person believed or intended. The question of what inference to draw is a question of fact (*People v. Lattimore*, 2011 IL App (1st) 093238, ¶ 35; *People v. Colyar*, 407 Ill. App. 3d 294, 299 (2010)), and we defer to the trial court's determinations of fact unless they are against the manifest weight of the evidence (*People v. Hatchett*, 397 Ill. App. 3d 495, 502 (2009); *People v. Graham*, 392 Ill. App. 3d 1001, 1005 (2009); *People v. Walker*, 262 Ill. App. 3d 796, 801 (1994)).

¶ 20    A factual determination is against the manifest weight of the evidence only if the evidence clearly and indisputably calls for the opposite factual determination. *Robrock v. County of Piatt*, 2012 IL App (4th) 110590, ¶ 33. Thus, the issues in this appeal are as follows. Did the evidence in the State's offer of proof clearly and indisputably prove that Mallett believed his death was imminent when he made his statement to Strzesak in the hospital room, after surgery? See *id.*; Ill. R. Evid. 804(b)(2). And did the evidence in the State's offer of proof clearly and indisputably prove that, when defendant shot Mallett, he did so with the intent to procure Mallett's unavailability as a witness? See *Robrock*, 2012 IL App (4th) 110590, ¶ 33; Ill. R. Evid. 804(b)(5). As we will explain, the correct answer to both of those questions is no.

¶ 21                                    B. Dying Declarations

¶ 22    Illinois Rule of Evidence 802 (eff. Jan. 1, 2011), entitled "Hearsay Rule," provides: "Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Supreme Court, or by statute as provided in Rule 101 [(Ill. R. Evid. 101 (eff. Jan. 1, 2011))]." Illinois Rule of Evidence 801(c) (eff. Jan. 1, 2001) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." When Mallett made his statement to Strzesak in the hospital room, after surgery, he was not testifying at a trial or hearing. The State intended to offer this statement in evidence, during trial, for the truth of the matters asserted in the statement. Therefore, the statement is hearsay, and it is inadmissible except as provided by the Illinois Rules of Evidence, Illinois Supreme Court Rules, or statutes that do not conflict with "a rule or decision of the Illinois Supreme Court" (Ill. R. Evid. 101). See Ill. R. Evid.

802.

¶ 23 One of the exceptions to the hearsay rule that the State invokes in this appeal (and which it invoked below) is the exception for dying declarations. Illinois Rule of Evidence 804(b)(2) provides as follows:

> "(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> ***
>
> (2) Statement Under Belief of Impending Death. In a prosecution for homicide, a statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death."

¶ 24 The trial court was unconvinced that, when Mallett made his statement to Strzesak after the surgery, Mallett believed his death to be imminent or impending. The State argues, to the contrary, that the circumstances of Mallett's statement clearly indicated he was aware of his impending death. The State says: "He had suffered a very grave injury and was still receiving treatment for what was apparently a still open wound. He was attached to medical devices and died only a short time after his statement. This was sufficient to support admission of this recovery room statement as a dying declaration." Then the State cites *Walker*, 262 Ill. App. 3d at 801, *People v. Barnes*, 117 Ill. App. 3d 965, 970 (1983), and *Graham*, 392 Ill. App. 3d at 1006-07.

¶ 25 In all three of those cases–*Walker*, *Barnes*, and *Graham*–the trial court and the appellate court found a hearsay statement by the victim to be admissible as a dying declaration. Before we distinguish those cases on their facts, we point out that, even if the facts in those cases were comparable to the facts in this case, it would not necessarily follow that the trial court's decision in this case was against the manifest weight of the evidence. Just because it would be reasonable to draw an inference from the evidence, it does not necessarily follow it would be unreasonable to decline to draw that inference from the evidence. It is possible to conclude that neither of two opposing propositions is against the manifest weight of the evidence.

¶ 26 So, merely claiming similarities between this case and *Walker*, *Barnes*, and *Graham* does not make much of an argument for reversal. In any event, the comparison is strained. In *Walker*, the victim made his statement at the crime scene, a few minutes after being shot twice in the back. *Walker*, 262 Ill. App. 3d at 801. Mallett, by contrast, made his third statement in the hospital, after coming through surgery. (The trial court found Mallett's first statement, the one he made at the crime scene, to be admissible as a dying declaration.) In *Barnes*, the assistant State's Attorney visited the victim in the hospital and "asked the victim if he realized that he was in imminent danger of dying and had little or no chance of recovery. The victim nodded affirmatively." *Barnes*, 117 Ill. App. 3d at 968. No one asked Mallett that question when he was in the recovery room of Carle Hospital, and he never communicated any belief that his death was impending. In *Graham*, the victim apparently had just arrived in the hospital, and as medical personnel were working on him, he asked a nurse, over and over again, to tell his mother that he " 'really tried' " and that he " 'really

loved her.' " *Graham*, 392 Ill. App. 3d at 1006-07. Evidently, he believed he would never see his mother again. *Id.* at 1006. Mallett never said anything comparable in the recovery room of the hospital.

¶ 27 The State argues that, "[c]ontrary to the trial court's decision," there is no requirement that the victim was told he was dying or that he state his belief that he was dying. "Instead," the State notes, "the belief in impending death can be established circumstantially, including by evidence of the nature of his wounds." See *Hatchett*, 397 Ill. App. 3d at 502-03. The trial court never suggested, however, that being told one is dying or stating one's belief that one is dying is the *sine qua non* of a dying declaration. Obviously, the court realized the potential ability of circumstantial evidence to prove this belief, not only because the court explicitly said this belief could be inferred from circumstantial evidence, but also because the court found Mallett's first statement to be admissible as a dying declaration, even though no one had told Mallett he was dying and even though he never expressed a belief that he was dying. With respect to Mallett's third statement, the court considered the lack of those circumstances to be relevant–which was not the same as saying that the presence of those circumstances was categorically essential for a dying declaration.

¶ 28 Granted, the surgical incision in Mallett's abdomen looks gruesome in People's exhibit B. It is unclear that Mallett would have been able to see the incision, but, just from the way he no doubt felt, it would seem reasonable to infer that he regarded his survival as far from assured. But that would not be the same as believing his death was inevitable and imminent. See *People v. Tilley*, 406 Ill. 398, 406 (1950) ("[A] fixed belief in inevitable and imminent death must be entertained by the declarant."). He had lived through the surgery. He was still being treated. It simply is unknowable what he believed. We are unable to say it is clear and indisputable that Mallett believed his death was imminent when he spoke with Strzesak in the recovery room. See Ill. R. Evid. 804(b)(2); *Hatchett*, 397 Ill. App. 3d at 502; *Robrock*, 2012 IL App (4th) 110590, ¶ 33.


¶ 29                          C. Forfeiture by Wrongdoing

¶ 30 Illinois Rule of Evidence 804(b)(5) provides as follows:

"(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

* * *

(5) Forfeiture by Wrongdoing. A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."

As the trial court reasoned, this exception to the hearsay rule requires more than procuring the unavailability of the declarant; every murder makes the victim unavailable for all purposes. Rather, the party must commit, or acquiesce in, the wrongdoing with the intent to procure the unavailability of the declarant *as a witness*. *Id.*

¶ 31 The State argues that defendant had an intent to procure Mallett's unavailability as a witness. The State reasons:

"In this case, the intent to kill Mallett to prevent him from testifying may be inferred from the circumstances surrounding the homicide. The defendant shot Mallett at close range in the back after taking Mallett's wallet. The shooting was not necessary in order to accomplish the robbery since the taking of property had proceeded [*sic*] the shot. Mallett was known to the defendant and knew where he lived. Under these circumstances, it can be reasonably inferred that defendant knew that Mallett would be able to identify him and that the defendant deliberately shot him to prevent him from going to the police or testifying against him."

There are two problems with this reasoning. First, the State refers to what "*may* be inferred" and to what "*can* be reasonably inferred." (Emphases added.) Even if one *may* or *can* reasonably infer that defendant had the intent to procure Mallett's unavailability as a witness, it does not follow that the opposite inference, that defendant lacked such an intent, is unreasonable or against the manifest weight of the evidence. Second, the State makes factual representations to us that were not in the offer of proof. The State tells us: "The defendant shot Mallett at close range in the back *after taking Mallett's wallet*. The shooting was not necessary in order to accomplish the robbery since *the taking of property had [preceded] the shot*." (Emphases added.) But Clifton never said that in his offer of proof. He never said that defendant took Mallett's wallet first and then shot him. Instead, Clifton told the trial court: "As Mallett began to turn around he was struck in the head with a fist. The defendant then *tried* to take his wallet and then pulled what appeared to be a black, 9-millimeter, semiautomatic pistol from his waistband and shot [M]allet in the back." (Emphasis added.) It appears that Mallett was shot during the struggle for his wallet, not after the taking of his wallet. Given the State's offer of proof, the shooting appears to have been motivated by the procurement of Mallett's wallet, not by the procurement of his unavailability as a witness.

¶ 32                                    III. CONCLUSION

¶ 33        For the foregoing reasons, we affirm the trial court's judgment.

¶ 34        Affirmed.