# Illinois Official Reports

## Appellate Court

---

### *People v. Perkins*, 2018 IL App (1st) 133981

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALVIN PERKINS, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-13-3981 |
| Filed<br>Rehearing denied | January 24, 2018<br>April 5, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-16070; the Hon. Luciano Panici, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Benjamin A. Wolowski, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HOWSE delivered the judgment of the court, with opinion.<br>Justices McBride and Ellis concurred in the judgment and opinion. |

**OPINION**

¶ 1        The State charged defendant, Alvin Perkins, with the first degree murder of his ex-girlfriend and neighbor, Teresa Iacovetti, who was shot in the face on June 26, 2007. Teresa died from her injuries several days later. Within hours after being shot, Teresa identified defendant as the shooter to three police officers, and those three identifications were all admitted into evidence at defendant's jury trial. The Cook County circuit court admitted one of those identifications under the forfeiture-by-wrongdoing doctrine. Following the trial, the circuit court of Cook County convicted defendant of first degree murder and sentenced him to 35 years in the penitentiary for the murder and a consecutive sentence of 35 years for personally discharging the firearm that caused Teresa's death. Defendant appealed his conviction arguing, *inter alia*, the trial court improperly admitted all three of Teresa's statements identifying him as her shooter and, in particular, the court erred when it applied the wrong standard to determine whether the forfeiture-by-wrongdoing doctrine applied to admit one of the victim's statements. We retained jurisdiction of defendant's appeal and remanded the matter to the trial court for the court to determine whether the State proved, by a preponderance of the evidence, defendant shot Teresa with the intent of preventing her from testifying as a witness against him. On remand, the trial court held a hearing, after which it found the State proved by a preponderance of the evidence that defendant intended to prevent Teresa from testifying. Defendant filed a supplemental brief concerning the hearing on remand but withdrew it. For the reasons that follow, we affirm.

¶ 2                                          BACKGROUND
¶ 3        The State charged defendant by indictment with the first degree murder of his ex-girlfriend and neighbor, Teresa Iacovetti, who was shot on June 26, 2007, and died several days later. At the time he was charged, defendant faced the possibility of being sentenced to death if convicted.

¶ 4                                       Procedural History
¶ 5        During court appearances prior to trial, defense counsel expressed concern about defendant's mental status. On April 15, 2009, defense counsel indicated to the court that defendant's fitness and sanity may be an issue at trial. Counsel also stated that defendant had a mental health history. On July 9, 2009, defendant's attorneys tendered a package of information relating to defendant's psychological history. At that time, defense counsel indicated that defendant still needed to undergo psychological testing. The State also informed the court that defendant was schizophrenic, questioned whether defendant was on medication, and indicated that defendant would need to be tested. Defense counsel confirmed that defendant was on medication.

¶ 6        On September 23, 2009, just as defense counsel presented a motion to preclude the death penalty, defendant objected to his counsel's representation and indicated that he wanted to represent himself. Specifically, defendant stated: "Judge, I would like to speak on account of my own behalf. I would like to represent myself *pro se* in this criminal proceeding thus far. I have an objection to [defense counsel] representing me any farther in these proceedings. And I'm also demanding trial today. I'm demanding trial, sir, speedy trial today." When the judge asked defendant whether he understood "what's involved in a death penalty case," defendant

responded, "Sir, I don't—I'm not interested in that right now, your Honor. I want to represent myself, please. I have a Constitutional right to represent myself in these criminal proceedings. And I'm demanding trial." During this exchange, defense counsel advised the court that "we have four experts, an investigator, and mitigator, as well as three attorneys on this case. Nobody's ready because experts' work has not been completed, reports have not been produced, and investigation is still ongoing." Defense counsel then concluded, "So we're not anywhere near setting this case for trial." The court then denied defendant's request to represent himself.

¶ 7 Later, in May 2010, in response to defendant's filing of *pro se* speedy trial demands, the trial court informed defendant that it could not accept motions from him because he was represented by counsel. In March 2011, after the parties agreed to a continuance, defendant interrupted, saying that he had already complained to his lawyer about being locked up for three years and nine months and that he wanted to go to trial. The court advised defendant that he was represented by an attorney and the court would only accept motions from his attorney. The court also stated the case could not proceed to trial until defendant's attorney filed a certificate of readiness because this was a death penalty case. Defendant responded, "Well, I am the one on trial here." Defendant again demanded trial, and the trial court judge responded that his request was "[n]ot valid."

¶ 8 At the request of defense counsel, the trial court ordered a fitness evaluation of defendant at the end of 2009. In January 2010, defendant refused to participate in the evaluation, but the evaluation was conducted on February 19, 2010. From that evaluation, it was reported that defendant was fit for trial and sane at the time of the offense. However, the report noted that fitness to stand trial while medicated would be assessed in a separate evaluation since defendant was on medication. Defense counsel then indicated that he would not be pursuing an insanity defense.

¶ 9 The second evaluation found defendant fit for trial with medication, as he was taking some psychotropic medications like Risperidone, Zyprexa, and hydroxyzine. The doctor evaluating defendant deferred any opinion as to defendant's sanity at the time of the offense since defendant had insisted he was not raising an insanity defense.

¶ 10 In March 2011, the trial court indicated that the death penalty was no longer an option in the case since the death penalty had been abolished in Illinois. Nothing in the record indicates that defendant renewed his request to represent himself after he was found fit for trial.

¶ 11 Prior to trial, defendant filed a motion *in limine* to exclude as hearsay three statements by Teresa, now deceased, to police identifying defendant as the person who shot her. The shooting itself occurred at approximately 12:20 a.m. on June 26, 2007. The first statement was made to Officer Alfredo Salinas while Teresa was in the emergency room trauma center at approximately 1:46 a.m. In this statement, Teresa identified defendant as her shooter. The second statement was made to Officer Daniel Riegler at approximately 2 a.m. Officer Riegler asked Teresa who shot her, and she named defendant. Teresa then twice stated, "I can't believe Alvin shot me." The third statement was made later that day, between 9 a.m. and 2 p.m., to Detective Mikal El-Amin. Detective El-Amin asked Teresa what happened, and Teresa told him that she was watering plants in the yard when she saw defendant enter the yard from the alley. She stated when defendant came to the yard, he said, "I told you what was going to happen, b***." She stated he then pointed a gun at her and shot her in the face.

¶ 12    The parties argued the admissibility of the statements in two discrete motions: the first concerning the identifications Teresa made to Officers Salinas and Riegler, and the second regarding Teresa's statement later in the day to Detective El-Amin, which was more detailed.

¶ 13    At the hearing on the admissibility of the statements, the parties proffered statements contained in the police reports and did not present any witnesses. With respect to the first two statements, the defense argued that to admit those hearsay statements would violate defendant's sixth amendment rights. The State in turn argued the statements were admissible as either excited utterances or dying declarations. The trial court admitted the first two statements as either dying declarations or excited utterances, finding that there was not enough time for Teresa to fabricate a story. With respect to the third, more detailed statement to Detective El-Amin, the State argued the identification was admissible pursuant to the statutory forfeiture-by-wrongdoing exception to the rule against hearsay found in section 115-10.7 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.7 (West 2012)).

¶ 14    At the hearing on defendant's motion *in limine*, the State argued that pursuant to subsection (d) of the statute, if it proved by a preponderance of the evidence that defendant murdered Teresa, the State was not required to show that defendant's purpose in committing the murder was to create the unavailability of a witness for the exception to apply and the statement to be admitted. Even if the State did have to show a motive, the State contended that defendant was motivated to kill Teresa to silence her from testifying about the fact defendant violated an order of protection by contacting her on the night of the shooting and that he had a previously stricken criminal damage to property case, which alleged defendant attempted to pry open Teresa's door about a month earlier.

¶ 15    The defense responded by arguing the State's argument as to defendant's motive was illogical—it did not make sense for defendant to create a situation where he violated an order of protection so that he then had to kill Teresa. Further, the defense argued the criminal damage to property case had been stricken and could not automatically be reinstated. The court ultimately found the third identification was admissible where the State had met its burden and where there was no intent requirement in the forfeiture-by-wrongdoing statute.

¶ 16    Defendant appealed his conviction on the grounds the trial court improperly admitted Teresa's hearsay statements and improperly denied his request to represent himself. Concerning the admission of Teresa's statements, defendant argued, in part, that the trial court used the wrong standard when it admitted Teresa's statements under the forfeiture-by-wrongdoing doctrine. This court found that "[i]n ruling that the statements were admissible pursuant to the statute, the trial court noted its interpretation of the statute and stated: 'Basically it is saying, as I read the statute, if the State is able to prove that the defendant, by a preponderance of the evidence, killed the witness, then that's all they have to prove.' " 2016 IL App (1st) 133981-U, ¶ 18. We noted that "the trial court judge never made a finding of fact regarding whether defendant, by his actions, intended to procure Teresa's absence at trial, which is a requirement for the application of the forfeiture-by-wrongdoing doctrine under the Supreme Court's ruling in [*Giles v. California*, 554 U.S. 353, 377 (2008)]." 2016 IL App (1st) 133981-U, ¶ 19. Based on the record then before us, we could not presume the trial court judge knew intent to kill the witness to prevent her from testifying at trial was a requirement under the forfeiture-by-wrongdoing doctrine and thus remanded the matter to the trial court for a hearing on whether the State proved that contention by a preponderance of the evidence. *Id.*

We ordered that following the hearing on remand, we would "address the remaining issues including any issue that may arise on remand from the hearing." *Id.* ¶ 21.

¶ 17 At the hearing on remand, the State did not present any witnesses. The State argued the evidence showed that defendant shot Teresa in the face "to ensure her unavailability against him in a criminal damage to property case on a violation of order of protection." The State argued that defendant and Teresa had a dating relationship and that beginning in April 2007 "there were a series of events that he committed against her." The State recounted incidents of defendant using a screwdriver on Teresa's sister's car in an attempt to take back a windshield he had installed, using a pry bar on the door to Teresa's home, repeatedly calling Teresa and pounding on her front door, and, the day after the last incident, breaking a window in Teresa's house. The State said the last incident resulted in a criminal damage to property case against defendant. Police arrested defendant for the criminal damage to property, and defendant "told the police officer, 'I know what I'm going to need to do when I get out.' " When defendant was arrested, the trial court entered a two-year order of protection against defendant ordering him to stay away from Teresa, her son, and her house. The State argued that a few days after his arrest defendant repeatedly called Teresa and his friends repeatedly called Teresa "making threatening remarks to her about not going to court, about not testifying against him." Teresa did not appear in court for the criminal damage to property case, and the charges were stricken with leave to reinstate. The order of protection was continued and was in effect following the dismissal with leave to reinstate of the criminal damage to property case. The State recounted the instant offense, then argued as follows:

"This evidence shows that the defendant was not going back to jail. He did not want to go back to jail and some of the threatening phone calls he made to Teresa in the criminal damage to property case, he would say, don't call the police, don't call the police. Well, here he knew what he had to do. He was not going back to jail.

So when Teresa was not amenable to his visitation after midnight, he thought she's calling the police, I'm not going back and he shoots her in the face with the intent of preventing her from testifying in the criminal damage to property case and in certainly the violation of order of protection case that's coming as she's calling the police."

¶ 18 The defense argued the criminal damage to property case had been stricken and was not pending and there was no pending violation of an order of protection. The defense argued there was "nothing active or pending in the court system where we could presume [defendant] went to [Teresa's] house that morning intending to prevent her from going to court." The defense further argued "[t]here could be something to reinstate, but what motivation does the victim have here to go to court and reinstate either the order of protection or the criminal damage to property case at this point? There's none." The defense argued that defendant's appearance on Teresa's property did not give rise to an inference that he put himself in that position so that he could kill her to prevent her from going to court. The defense concluded by arguing it was not enough that defendant went to Teresa's home intending to kill her; "[y]ou have to show he went there intending to *** produce her unavailability as a witness," and Teresa "was not a witness against him in anything."

¶ 19 The State replied the forfeiture-by-wrongdoing doctrine does not require there to be a pending case for the doctrine to apply. In support of that assertion, the State cited the decision in *People v. Hanson*, 238 Ill. 2d 74 (2010), in which, the State argued, no case was pending against the defendant when he killed his sister and the deceased sister's statements were

- 5 -

admitted against the defendant under the forfeiture-by-wrongdoing doctrine. The State argued that case proved the doctrine applied where the defendant feared a future prosecution in which the decedent would have been a witness. The State pointed out that Teresa had called police about defendant numerous times and defendant had "made it clear to the police that he knew what he needed to do." The State also asserted that in one of his phone calls to Teresa, defendant told Teresa he "didn't want her calling the police on him." The State argued "it does not matter that there wasn't a case pending. It's that he actually shot her because he was not going back to jail. He was not going to let her call the police. He was not going back for criminal damage to property. He was not going back for violation of an order of protection."

¶ 20 Following the parties' arguments, the trial court first found that "as the defense alleges in his response, there is no dispute to the facts that were presented by the State." The court noted that defendant kept calling and threatening Teresa, that his threats "worked the first time," and that defendant stated to police that he knew what he had to do when he got out after police arrested defendant for criminal damage. The court held

> "the victim was in fear of her life and I believe that by [a] preponderance of the evidence the State did prove that the defendant intended to prevent her from testifying in a violation of an order of protection, if nothing, [*sic*] and also under the possibility of having the case reinstated, the criminal damage to land case. So therefore I believe that the common law forfeiture by wrongdoing [applies] ***."

¶ 21 Defendant filed a supplemental brief concerning the ruling on remand but later filed a motion to withdraw that brief and dispense with further briefing. The motion to withdraw states "the briefs previously filed in this case adequately address the unresolved issues remaining before [the appellate court]" and asks this court to "decide the issues remaining before it."

¶ 22 Trial Evidence

¶ 23 At defendant's jury trial, Erik DePillars, Teresa's son who was nine years old when Teresa was shot, testified that shortly after midnight on June 26, 2007, he was in the living room reading a book. He heard a knock at the door and answered it. Erik testified that he recognized the man at the door as his mother's ex-boyfriend, Alvin Perkins. Erik stated that he went and sat back down while his mother talked to defendant at the front door. Erik testified that after a few minutes his mother shut the door and locked it and ran to the back door. Erik did not know what was going on, so he got up and walked towards the back of the house. He was waiting in the kitchen when he heard his mother scream, then heard a "crack" that sounded like a gunshot. He grabbed a knife from the kitchen and ran outside. Once outside, Erik saw his mother lying on the back step in a puddle of blood. He did not see anyone else in the backyard. He went inside and called police. When he came back out, his mother was still conscious, and a neighbor had come over and was using a hose to wash blood off his mother's face.

¶ 24 Officer Alfredo Salinas testified that at about 12:20 a.m., he and his partner received a call about shots fired. They arrived at Teresa's house about three to four minutes later. They went to the backyard and saw Teresa receiving aid from paramedics. Officer Salinas and his partner had a brief conversation with Erik, and after that, they began to look for defendant. Officer Salinas walked from Teresa's home across the alley to defendant's apartment building. He knocked on the back door, but there was no response. He went around to the front door, and defendant answered. Officer Salinas recounted that defendant did not appear to be out of breath, he did not have any blood on him anywhere, and he did not have a gun on him. Officer

Salinas arrested defendant and gave him his *Miranda* (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) warnings. He asked defendant whether he had spoken with Teresa, and defendant responded that "he had had contact with her approximately an hour prior, and that he had called her around 12:00 midnight on her phone." The officers made a cursory search of defendant's house and Teresa's backyard but did not find a gun.

¶ 25        Officer Salinas then went to the hospital where Teresa had been taken and spoke with her at 1:46 a.m. They spoke for about two minutes until hospital personnel told Officer Salinas to stop. Officer Salinas recounted that Teresa recognized him by name based on a previous incident a month earlier. He noted that she appeared to be in a lot of pain but could still speak coherently. Teresa told Officer Salinas that defendant had shot her in the face.

¶ 26        Officer Daniel Riegler testified that when he arrived at Teresa's house at about 1:30 a.m., he noticed a lot of blood on the back patio and on the rear wall of the house. He collected a .22-caliber shell casing, a cordless telephone, and a 40-ounce bottle of malt liquor. He also took photos of the scene and the items he recovered. After spending about half an hour at the scene, Officer Riegler went and spoke with Teresa at the hospital. He recounted that Teresa was still in the emergency room trauma center and her mother, brother, and son were present. Officer Riegler testified that she appeared coherent and able to understand his questions. Officer Riegler asked who shot her, and she named defendant. She then twice stated, "I can't believe Alvin shot me." After visiting Teresa, Officer Riegler went to the Chicago Heights police department and spoke with defendant. He collected defendant's shirt and put it in a paper evidence bag, which was submitted to the state police for testing.

¶ 27        Detective El-Amin testified that he spoke with Teresa sometime between 9 a.m. and 2 p.m. on the day of the shooting and she gave him a narrative statement about the shooting. He asked Teresa what happened, and she told him that she was watering plants in the yard when she saw defendant enter the yard from the alley. She stated when defendant came into the yard, he said, "I told you what was going to happen, b***," and that is when he raised his hand with a gun in it and shot her in the face. She said she fell to the ground and realized she was bleeding heavily. Her son came to the yard, and then a neighbor came over and used a hose to wash some of the blood off her face.

¶ 28        Ellen Chapman, a forensic scientist with the Illinois State Police Forensic Science Center's evidence unit, testified that she was tasked with checking a shirt for gunshot residue. She took samples from the shirt's right sleeve and right shoulder. The sample from the right sleeve contained some particles but not enough to be able to say it was positive for residue. She said the sample from the right shoulder did have "unique tricomponent gunshot residue particles." She opined that this would mean either that the shirt contacted an item with gunshot residue, it was within the environment of a fired gun, or someone wearing the shirt fired a gun.

¶ 29        It was stipulated that a July 5, 2007, autopsy revealed that Teresa died from a gunshot wound to the right side of her face.

¶ 30        The State introduced evidence related to an incident that occurred in May 2007. Officer Salinas testified that on May 6, 2007, he had been dispatched to Teresa's house for a call regarding criminal damage to property. Officer Salinas spoke with Teresa and Travis Mitchell, then arrested defendant at his apartment, located directly behind Teresa's house. As Officer Salinas was processing defendant, defendant said out loud, "I know what I am going to have to do when I get out of jail." Travis Mitchell testified that he was at Teresa's house that night, playing with Erik and another friend. They heard someone knocking at the door, and eventually

they heard glass break. He looked through a window and, as a result, was able to identify defendant in court as the person he saw banging on the door. Mitchell said he and the other boys got scared and ran to the back of the house and made a telephone call to Teresa, who was not home at the time. Teresa called the police, and she ended up arriving back home a few minutes later.

¶ 31    Finally, the State was permitted to introduce a plenary order of protection Teresa had against defendant that was in place at the time of the shooting.

¶ 32    Defense counsel moved for a directed verdict, which was denied.

¶ 33    The defense called Jesse Taylor, who testified that on the evening of the shooting, he and defendant were at defendant's apartment drinking a few beers and playing chess. At around "eleven something," defendant had fallen asleep, and Taylor left to go to his mother's house, which was about 10 to 12 minutes away by bicycle. He recalled that he got to his mother's house sometime before 12 a.m.

¶ 34    Larrison Molex testified that he stopped by defendant's house that night at around 11 p.m., but he only stayed for about four or five minutes. He recalled that defendant and Taylor were playing chess at the time.

¶ 35    The jury returned a guilty verdict as to first degree murder.

¶ 36    The defense filed a posttrial motion challenging, among other issues, the admission of Teresa's statements of identification to police at the hospital. That motion was denied.

¶ 37    The trial court sentenced defendant to a term of 70 years in prison, 35 years for murder and 35 years for personally discharging the firearm that caused Teresa's death. Defendant filed a motion to reconsider, which was denied. Defendant timely filed a notice of appeal, and an amended notice of appeal was allowed on January 6, 2015. On appeal, defendant argues the trial court erred in denying his motion to represent himself and in allowing Teresa's statements of identification into evidence.

¶ 38                                          ANALYSIS

¶ 39    Defendant argues his conviction must be reversed and the matter remanded for a new trial because (1) the trial court denied him his right to represent himself at trial and (2) the admission of Teresa's three statements to police identifying him as her killer violated his sixth amendment right to confront witnesses. We address each argument in turn.

¶ 40                        Defendant's Request for Self-Representation

¶ 41    A defendant has a constitutional right to represent himself. *Faretta v. California*, 422 U.S. 806, 835 (1975); *People v. Baez*, 241 Ill. 2d 44, 115 (2011). To represent himself, a defendant must knowingly and intelligently relinquish his right to counsel. *Faretta*, 422 U.S. at 835; *Baez*, 241 Ill. 2d at 115-16. It is well settled that waiver of counsel must be clear and unequivocal, not ambiguous. *Baez*, 241 Ill. 2d at 116. A defendant waives his right to self-representation unless he articulately and unmistakably demands to proceed *pro se. Id.* The purpose of requiring that a criminal defendant make an unequivocal request to waive counsel is to: "(1) prevent the defendant from appealing the denial of his right to self-representation or the denial of his right to counsel, and (2) prevent the defendant from manipulating or abusing the system by going back and forth between his request for counsel and his wish to proceed *pro se.*" *People v. Mayo*, 198 Ill. 2d 530, 538 (2002). In determining whether a defendant's

statement is clear and unequivocal, a court must determine whether the defendant truly desires to represent himself and has definitively invoked his right of self-representation. *Baez*, 241 Ill. 2d at 116.

¶ 42     Although a court may consider a defendant's decision to represent himself unwise, if his decision is freely, knowingly, and intelligently made, it must be accepted. *People v. Lego*, 168 Ill. 2d 561, 563-64 (1995); *People v. Silagy*, 101 Ill. 2d 147, 179-80 (1984). The requirement of knowing and intelligent choice "calls for nothing less than a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Lego*, 168 Ill. 2d at 564. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances of that case, including the background, experience, and conduct of the accused. *Id.* at 565. Courts must "indulge in every reasonable presumption against waiver" of the right to counsel. *Brewer v. Williams*, 430 U.S. 387, 404 (1977); *People v. Burton*, 184 Ill. 2d 1, 23 (1998).

¶ 43     If the trial court allows the defendant "to proceed *pro se*, the trial court must determine, in open court, that the defendant understands the nature of the charge, the minimum and maximum sentence pr[e]scribed by law, and that he has a right to have counsel appointed if he is indigent." *People v. Harris*, 2013 IL App (1st) 111351, ¶ 79; Ill. S. Ct. R. 401(a) (eff. July 1, 1984) ("Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following: (1) the nature of the charge; (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and (3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court.").

¶ 44     Defendant concedes he forfeited his claim regarding the trial court's denial of his request to represent himself where it was not objected to at trial or in his motion for a new trial; however, as both parties correctly point out, an error in denying a defendant the right to represent himself is a structural error that we may review regardless of forfeiture. *People v. Washington*, 2012 IL 110283, ¶ 59 (a structural error is "a systemic error that serves to erode the integrity of the judicial process and undermine the fairness of a trial"); *People v. Jackson*, 2015 IL App (3d) 140300, ¶¶ 54, 56. We review a trial court's determination on the issue of self-representation for an abuse of discretion. See *Burton*, 184 Ill. 2d at 25 (finding no abuse of discretion in requiring counsel's continued representation); *People v. Jackson*, 228 Ill. App. 3d 868, 875 (1992). An abuse of discretion occurs only where the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Phillips*, 392 Ill. App. 3d 243, 272 (2009).

¶ 45     On September 23, 2009, defendant stated to the trial court: "Judge, I would like to speak on account of my own behalf. I would like to represent myself *pro se* in this criminal proceeding thus far. I have an objection to [defense counsel] representing me any farther in these proceedings. And I'm also demanding trial today. I'm demanding trial, sir, speedy trial today." When the judge asked defendant whether he understood "what's involved in a death penalty case," defendant responded, "Sir, I don't—I'm not interested in that right now, your Honor. I want to represent myself, please. I have a Constitutional right to represent myself in these criminal proceedings. And I'm demanding trial." Following comments by defendant's attorney, the court denied defendant's request to represent himself. Defendant argues the trial

- 9 -

court abused its discretion when it denied his request to represent himself because (1) defendant's legal acumen should not have been considered in the trial court's determination, (2) defendant had no mental defects that would have prevented him from proceeding *pro se* as he was found fit for trial, and (3) the trial court failed to follow Illinois Supreme Court Rule 401 (eff. July 1, 1984) in considering defendant's request.

¶ 46    The State argues the trial court properly denied defendant's request to represent himself where defendant's request was not unequivocal, defendant did not understand the nature of the charges against him, and defendant lacked the mental ability to knowingly and intelligently relinquish his right to counsel.

> "A finding that the right to counsel has been waived is not to be made lightly. [Citations.] In assessing the validity of a waiver, a reviewing court must determine whether there was an intelligent relinquishment or abandonment of a known right or privilege. [Citation.] More than a routine inquiry is required to make this determination. [Citation.] Such a finding should be preceded by a careful inquiry by the court, aimed at determining the defendant's ability to conduct his own defense. [Citation.] Moreover, the waiver of any constitutional right requires the highest level of competency. [Citations.] In this context one court has stated that '[a]ny waiver of counsel is carefully scrutinized "[b]ecause of the importance of the right to counsel in preserving the free exercise of other constitutional rights in the criminal process." [Citation.]' [Citation.]
>
> Thus, in addition to engaging in a colloquy with the defendant to advise him of his right to counsel, the court must still determine for itself whether the accused has the requisite capacity to effectuate an intelligent waiver of his right. The objective criteria commonly utilized by courts to make this determination are the defendant's age [citation], level of education [citation], *mental capacity* [citation] and prior involvement, if any, in legal proceedings [citation]. On the basis of the surrounding circumstances and these relevant factors, the trial court must make a subjective evaluation of whether an accused was aware of what he was doing." (Emphasis added.) *People v. Vanderwerff*, 57 Ill. App. 3d 44, 49-50 (1978).

¶ 47    We find that the trial court did not abuse its discretion when it denied defendant's request to represent himself. The sixth amendment requires the court to honor a defendant's choice to represent himself, even if the choice is in all likelihood a disastrous one for the defense, "[u]nless the defendant [has] a mental disability that incapacitated him from understanding the content of Rule 401(a)." *People v. Fisher*, 407 Ill. App. 3d 585, 590 (2011).

> "[D]efendant's request for self-representation may be denied when, despite the court's efforts to explain the consequences of waiver, the court finds the defendant is unable to reach the level of appreciation needed for a knowing and intelligent waiver. ([2 Wayne R. LaFave and Jerold H. Israel, Criminal Procedure § 11.5(d), at 47-48 (1984)].) We emphasize, however, that this is an inquiry into the defendant's ability to make a knowing and intelligent waiver of his right to counsel; it is not an inquiry into defendant's ability to do an appropriate job defending himself at trial. As Professors LaFave and Israel have noted, 'Trial courts hesitate to deny the request of an adult defendant unless he appears to be suffering from some significant mental disability.' (LaFave and Israel, § 11.5(d), at 48.) We agree that this standard should guide the trial courts as they make such inquiries and resolve the question of whether defendant can

make an intelligent waiver of his right to counsel." *People v. Ward*, 208 Ill. App. 3d 1073, 1084 (1991).

¶ 48 The record shows that at the time defendant made the request to represent himself, the trial court was aware there was an issue raised concerning defendant's mental capacity and statements that defendant was schizophrenic and taking psychotropic medication. Further, when defendant requested to represent himself, he requested a trial that day, even though discovery had not yet been completed. Most importantly, when the trial judge asked defendant if he understood what was involved in a death penalty case, defendant responded, "Sir, I don't—I'm not interested in that right now, your Honor." Based on these facts, and given that we are to "indulge in every reasonable presumption against waiver" of the right to counsel (*Burton*, 184 Ill. 2d at 23), we cannot say that no reasonable person would have adopted the view of the trial court in finding defendant's request to represent himself was not knowingly and intelligently made. *Phillips*, 392 Ill. App. 3d at 272. Further, contrary to defendant's argument on appeal that the trial court applied a defective standard in evaluating his request by considering his understanding of capital litigation, defendant's lack of the requisite capacity to effectuate an intelligent waiver of his right to counsel "had nothing to do with inquiring into *** defendant's ability to conduct his own defense." See *Ward*, 208 Ill. App. 3d at 1083 ("the *Vanderwerff* court was discussing inquiries the trial court should make when determining whether a defendant is making 'an intelligent relinquishment or abandonment of a known right or privilege.' These inquires concerned waiver; they had nothing to do with inquiring into the defendant's ability to conduct his own defense ***." (Emphases omitted.)). Finally, we note that after defendant was found fit for trial with medication, he did not renew his request to represent himself.

¶ 49 Defendant also argues the trial court "failed to comply with Supreme Court Rule 401(a), which constitutes reversible error in and of itself."

> "A defendant who wishes to act *pro se* desires to stand alone, but this does not occur if a lawyer assists him at trial. In this instance, a defendant receiving such legal advice should not be heard to complain on appeal of improprieties pertaining to admonishments about proceeding *pro se* or of deficiencies apparent of record relating to a waiver of legal assistance." (Emphasis and internal quotation marks omitted.) *People v. Cemond*, 229 Ill. App. 3d 857, 863 (1992).

Because he lacked the mental capacity to make a knowing and intelligent waiver of counsel, defendant did not waive counsel and proceeded with the assistance of an attorney. In such a situation, the admonitions of Rule 401(a) are not required to be given. See *id.* at 862-63 (where trial court allowed the defendant to proceed *pro se* but "with the assistance" of an attorney who would be there "at all hearings [to] assist *** in any way"). We find no error in the trial court's denial of defendant's request to proceed *pro se*.

¶ 50                              Admissibility of Victim's Identification

¶ 51 Teresa gave three statements to police officers identifying defendant as her shooter before she died, all of which the trial court admitted in defendant's trial. Defendant argues these three statements of identification by Teresa were improperly admitted based on hearsay and the confrontation clause. When the admissibility of statements is at issue and the defendant raises both state hearsay claims and constitutional confrontation clause claims, our supreme court has instructed that reviewing courts must first determine whether the statements are admissible

under state hearsay laws before deciding any constitutional issues. *In re E.H.*, 224 Ill. 2d 172, 179-80 (2006) ("Only once the statement has first been found admissible as an evidentiary matter should constitutional objections—including *Crawford*-based confrontation clause claims—be dealt with. [Citations.] This is the only analytical 'flow chart' that comports with the rule that courts must avoid considering constitutional questions where the case can be decided on nonconstitutional grounds."); see also *People v. Melchor*, 226 Ill. 2d 24, 34 (2007). Therefore, we first address defendant's hearsay claims. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *People v. Gonzalez*, 379 Ill. App. 3d 941, 954 (2008). Generally, hearsay statements are inadmissible, but that rule has certain exceptions. *People v. Dunmore*, 389 Ill. App. 3d 1095, 1106 (2009).

¶ 52    At the outset, we note the parties disagree over the standard of review that should be applied when determining whether the trial court erred when it admitted Teresa's three statements of identification under exceptions to the hearsay rule. The State argues it is well settled that evidentiary rulings are within the sound discretion of the trial court and are reviewed for an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). Defendant argues there are no contested facts in this case and, as a result, pursuant to *People v. Aguilar*, 265 Ill. App. 3d 105, 109 (1994), we should apply a *de novo* review to the trial court's admission of Teresa's statements into evidence. For the reasons stated in *People v. Jenkins*, 2013 IL App (4th) 120628, ¶¶ 16-17, we find *Aguilar* inapplicable here. In *Jenkins*, the appellate court stated:

"*Aguilar* is different from this case, however, because, in *Aguilar*, the dispute was over the legal content of a hearsay exception—what the exception said—whereas, in the present case, the legal content of the hearsay exceptions is undisputed, and the only dispute is whether the trial court *had* to draw the factual inferences that would have brought the third statement within the hearsay exceptions.

In *Aguilar*, the trial court erroneously believed that, under the law, a hearsay statement by a defendant was admissible in evidence as an 'admission' only if the statement was an admission that the defendant had committed a crime or only if it was an admission of an element of the charged offense. [Citation.] The question on appeal, then, was purely a legal question regarding the content of the hearsay exception for admissions, a content determined solely by the common law: Did a hearsay statement by a defendant have to be inculpatory to be admissible as an admission? [Citation.] The appellate court said: 'The trial judge's decision was based on his interpretation of the admissions exception to the rule against hearsay. This case involves a legal issue and did not require the trial court to use its discretion regarding fact-finding or assessing the credibility of witnesses.' [Citation.] The appellate court decided, *de novo*, that the trial court was mistaken in its belief that an admission had to be inculpatory. [Citation.] According to case law, '[a]ny statement by an accused person, unless excluded by the privilege against self-incrimination or other exclusionary rules, [might] be used against him as an admission.' [Citation.]" (Emphasis in original.) *Id.*

¶ 53    We agree with the analysis in *Jenkins* and find that it applies equally here; as such, we follow the rationale laid out in *Jenkins* and find that the *de novo* standard of review is improper in this case. *Id.* The parties do not argue the trial court misinterpreted the exceptions to the state hearsay statutes as in *Aguilar*. Rather, defendant argues that, pursuant to the specific facts of this case, the trial court improperly found the statements fell within the statutory hearsay exceptions. The trial court has discretion to determine whether statements are hearsay and, if

- 12 -

so, whether they are admissible under an exception. *People v. Spicer*, 379 Ill. App. 3d 441, 449 (2008). Thus, we will reverse the trial court's hearsay ruling only for an abuse of discretion. *Id.* at 450. An abuse of discretion occurs where the trial court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Further, a factual determination is against the manifest weight of the evidence only if the evidence clearly and indisputably calls for the opposite factual determination. *Robrock v. County of Piatt*, 2012 IL App (4th) 110590, ¶ 33. We may affirm the trial court when correct for any reason appearing in the record. *People v. Merz*, 122 Ill. App. 3d 972, 976 (1984).

¶ 54　　The trial court admitted Teresa's first two statements under the dying declaration and excited utterance exceptions to the rule against hearsay and the third statement under the forfeiture-by-wrongdoing exception. We will address each exception to the hearsay rule below.

¶ 55　　　　　　　　　　　　　Dying Declaration

¶ 56　　The State argues Teresa's first two statements to police were admissible as dying declarations. A dying declaration is a statement of fact the victim made about the cause or circumstances of the homicide and is an exception to the hearsay rule under the Illinois Rules of Evidence. *People v. Gilmore*, 356 Ill. App. 3d 1023, 1031 (2005). Illinois Rule of Evidence 804(b)(2) (eff. Jan. 1, 2011) provides as follows: "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: *** (2) Statement Under Belief of Impending Death. In a prosecution for homicide, a statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death." A dying declaration is admissible as an exception to the hearsay rule because it poses a guarantee of trustworthiness based on the assumption that the belief of impending death excludes the possibility of fabrication by the declarant. *People v. Georgakapoulos*, 303 Ill. App. 3d 1001, 1008 (1999).

¶ 57　　To admit a statement as a dying declaration, the proponent must show (1) the statement relates to the cause or circumstances of the underlying homicide, (2) the declarant believes death is impending and almost certain to imminently follow, and (3) the declarant is mentally capable of giving an accurate statement regarding the cause or circumstances of the homicide. *People v. Graham*, 392 Ill. App. 3d 1001, 1006 (2009). The existence of these factors must be proven by the profferor beyond a reasonable doubt, based upon an examination of the totality of the facts and circumstances surrounding the declaration. *Georgakapoulos*, 303 Ill. App. 3d at 1009. Belief in the imminence of death may be shown by the declarant's own statements or from circumstantial evidence, such as the nature of the wounds or statements made in the declarant's presence. *Id.*; *Graham*, 392 Ill. App. 3d at 1006. At the time the statement is made, the declarant must be able to perceive and give a true and correct account of the facts to which the statement relates. *Georgakapoulos*, 303 Ill. App. 3d at 1009. "Courts of review are reluctant to disturb the trial court's ruling on the admissibility of a purported dying declaration [citations], and they will not disturb that determination unless it is palpably contrary to the manifest weight of the evidence [citations]." *Id.*; *People v. Cobb*, 186 Ill. App. 3d 898, 908 (1989) ("Our supreme court has stated that it is 'reluctant to disturb the ruling of the trial judge on the admissibility of a purported dying declaration.' " (quoting *People v. Odum*, 27 Ill. 2d 237, 239 (1963)).

¶ 58 In the trial court's oral ruling, it discussed the excited utterance exception to the hearsay rule in depth: "Okay. For a hearsay statement to be admissible under the spontaneous declaration or excited utterance exception there must be an occurrence sufficiently startling, reflective statement. There must be time—(inaudible)—the statement must relate to the circumstances of the occurrence." The judge then analyzed *People v. Lisle*, 376 Ill. App. 3d 67 (2007), a case in which statements were admitted as excited utterances, compared it favorably to this case, and stated:

> "And in this case, specifically, when the police officer came in and she said these things, the statement, in itself, reflects an excited utterance, 'I cannot believe that Alvin did this.' It is not something that, oh, Alvin did it, Alvin Perkins did this. She is like reflecting, I cannot believe this. So it is an excited utterance, and for that reason, it is admissible under the dying declaration exception to the hearsay rule. And for those reasons, those statements will come in."

The trial court made no factual findings on the record when it ruled that Teresa's first two identifications were admissible as dying declarations. In fact, the oral ruling was devoted almost entirely to a finding that the statements were excited utterances and mentioned dying declaration almost as an afterthought. The trial court judge did not discuss the dying declaration exception to the hearsay rule at any other time in his oral ruling or point out any evidence that would support a finding of a dying declaration. Defendant argues there was no evidence to suggest Teresa in fact thought her death was imminent. We agree.

¶ 59 In *People v. Beier*, 29 Ill. 2d 511, 515 (1963), the supreme court reversed the admission of a statement made by a man who had been shot in the face because there was no other evidence that he believed his death to be imminent. In so ruling, the court stated:

> "The belief of the dying man that death is impending furnishes the guaranty of truthfulness which makes his declaration admissible in evidence. The rule is that such a declaration must be made under the fixed belief and moral conviction of the person making it that his death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance, when he has despaired of life and looks to death as at hand. [Citation.] As this court said in the *Maria* case [citation], 'In the first instance the court must be satisfied, beyond a reasonable doubt, that the statement was made *in extremis*, and unless it was so made it should not be allowed to go to the jury.' " *Id.*

¶ 60 We acknowledge that a bullet wound to the face is serious. However, similar to *Beier*, there is nothing in the record from which we can find that Teresa believed her death was impending and almost certain to imminently follow. There are no statements from Teresa indicating she thought her death was imminent, and there are no statements from anyone else or evidence of anything that would have led Teresa to believe her death was imminent. See *Jenkins*, 2013 IL App (4th) 120628, ¶ 28 (although "the surgical incision in [the victim's] abdomen look[ed] gruesome" and "it would seem reasonable to infer that he regarded his survival as far from assured," the court held such a belief was not the "same as believing his death was inevitable and imminent," and where the court was "unable to say it is clear and indisputable that [the victim] believed his death was imminent when he spoke with [the police]," those statements were not admissible under the dying declaration exception to the hearsay rule). Instead, the record shows that Teresa was coherent at the time she made her statements and she did not die until nine days after the shooting and, therefore, nine days after the statements were made.

¶ 61    The language in our supreme court's decision in *People v. House*, 141 Ill. 2d 323 (1990), is also instructive. In *House*, the court affirmed the trial court's rejection of a statement as a dying declaration where there was no evidence that the declarant, who sustained severe burns over 40% of her body, "had been told she was going to die or that she believed she was going to die." *Id.* at 381; see also *People v. Harris*, 236 Ill. App. 3d 574, 579 (1992) (affirming rejection of statement as dying declaration where medical personnel did not advise declarant, who had been shot in the stomach by a 12-gauge, sawed-off shotgun, that she was in danger of dying and where declarant made no statement to the effect that she thought she was going to die); *People v. Timmons*, 127 Ill. App. 3d 679, 685 (1984) (affirming rejection of statement as dying declaration where there was no evidence that declarant, who had been shot in the carotid artery, jugular vein, and trachea, "believed himself *in extremis* when the statements were made" (internal quotation marks omitted)); *People v. Thomas*, 49 Ill. App. 3d 961, 971 (1977) (finding error in admission of statement as dying declaration where "no direct evidence that [declarant, who had been mortally injured by gunshot wounds to the stomach and hand] considered himself *in extremis*").

¶ 62    We recognize that since *House* was decided, our appellate court has upheld the admission of a statement as a dying declaration where there was no direct statement from the declarant or to the declarant, acknowledged by the declarant, that he or she was dying. However, we find those cases distinguishable from the case at bar.

¶ 63    In *People v. Walker*, 262 Ill. App. 3d 796 (1994), the court upheld the admission of statements as dying declarations and in doing so noted that "although there was no direct evidence that the [victim] believed his death was impending and certain to follow almost immediately, there was evidence that the victim complained of being unable to breathe, he knew he had been shot twice in the back, he was bleeding from his wounds, and was in such pain that he asked that no one touch him." *Id.* at 801. Further, the statements at issue in *Walker* were made at the scene of the crime only a few minutes after the declarant had been shot before any medical treatment had been rendered. *Id.* Here, Teresa made her statements at the hospital approximately an hour and a half after the shooting and after receiving medical treatment. Officer Salinas recounted that upon seeing Teresa at the hospital she appeared to be in a lot of pain but she could still speak coherently and recognized him by name based on a previous incident from a month earlier. *Walker* is distinguishable from this case because there, although the declarant did not specifically state that he believed his death was imminent, the declarant made the statements at the scene of the shooting before receiving any medical treatment and further made comments relating to the severity of his injuries. In this case, there is simply no evidence in the record from which we could find that Teresa believed her death to be imminent.

¶ 64    While the appellate court in *Georgakapoulos* stated "[i]t would seem that circumstantial evidence stemming from the declarant's physical condition would suffice as a basis from which to infer declarant's belief of the imminency of death" (*Georgakapoulos*, 303 Ill. App. 3d at 1011), we note that the *Georgakapoulos* court did not actually decide the issue of whether the statements in that case were admissible as dying declarations where the court had already found the statements to be admissible as spontaneous declarations. *Id.* at 1012 ("However, we need not dispositively resolve this lingering issue *since*, in any event, Jacob's statements were properly admitted as spontaneous declarations." (Emphasis in original.)). Despite the seriousness of Teresa's injury, there was no evidence proffered to show that Teresa believed her death to be imminent. See *People v. Lawson*, 232 Ill. App. 3d 284, 293 (1992) (in addition

- 15 -

to words and actions of the victim stating he believed he was dying, the court considered grievous nature of declarant's wounds as justifying the conclusion that the victim knew of the seriousness of his condition); *People v. Webb*, 125 Ill. App. 3d 924, 935-36 (1984) (where there was direct evidence of declarant's state of mind, which was that he thought that he was going to die, the trial court could have properly considered his six gunshot wounds in determining whether the declarant was aware of his impending death); *People v. Rhoads*, 110 Ill. App. 3d 1107, 1120 (1982) (where the decedent "(1) suffered second and third degree burns over 60% of her body, plus first degree burns over 20% of her body; (2) she said she thought she was going to die from her injuries; and (3) died 19½ hours after the fire, as a result of her burns," her statements were properly admitted as dying declarations).

¶ 65 In this case, there was no evidence in the record of any statements from Teresa indicating that she believed she was dying, there was no evidence or statements from any medical personnel or anyone else that might have led Teresa to believe she was dying, and Teresa did not make any of the statements at issue at the scene of the shooting prior to receiving any medical attention. Given the absence of any evidence in the record to suggest that Teresa believed her death to be imminent, we find Teresa's first and second statements were not admissible as dying declarations. *House*, 141 Ill. 2d at 381 ("the central issue in determining whether a statement is a dying declaration is whether the declarant believed he or she was dying. The rule is that the declaration must be made under the 'fixed belief and moral conviction' of the person making it that his or her death is 'impending and certain to follow almost immediately.' [Citation.]"). Accordingly, we hold the trial court abused its discretion when it found Teresa's statements met the requirements of a dying declaration where there was no evidence in the record to demonstrate beyond a reasonable doubt that Teresa believed her death to be imminent at the time she made the statements. See *Beier*, 29 Ill. 2d at 515.

¶ 66 Finally, we note that on appeal the State argues that Teresa's third statement was also admissible as a dying declaration. Although this argument was not made in the trial court, we may affirm the trial court on any reason found in the record. *Merz*, 122 Ill. App. 3d at 976. However, there is nothing to indicate that Teresa believed that she was about to die when she gave the third statement to the detective later in the day of the shooting. Therefore, we find the court erred when it admitted any statements as dying declarations.

¶ 67 Excited Utterance Under Illinois Hearsay Rules

¶ 68 The trial court also found that Teresa's first two statements were admissible under the excited utterance exception to the hearsay rule. An excited utterance or spontaneous declaration is a recognized exception in hearsay jurisprudence. *People v. Williams*, 193 Ill. 2d 306, 352 (2000). For a hearsay statement to be admissible under the excited utterance or spontaneous declaration exception there must be (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, (2) an absence of time for the declarant to fabricate the statement, and (3) a statement relating to the circumstances of the occurrence. *People v. Dobbey*, 2011 IL App (1st) 091518, ¶ 44; Ill. R. Evid. 803(2) (eff. Jan. 1, 2011). To this end, courts consider the totality of the circumstances, including the time elapsed between the event and the utterance, the nature of the event, the declarant's mental and physical condition, and the presence of self-interest. *Georgakapoulos*, 303 Ill. App. 3d at 1012; *Dobbey*, 2011 IL App (1st) 091518, ¶ 44. Whether a statement qualifies as an excited utterance is within the trial court's discretion. *People v. Gwinn*, 366 Ill. App. 3d 501, 517 (2006).

¶ 69    Here, defendant does not contest that the shooting was a sufficiently startling event or that Teresa's statements related to the circumstances of the shooting. Defendant argues that the State was unable to establish that her statements were sufficiently spontaneous and unreflecting or that there was a lack of time in which Teresa could have fabricated her statements. More specifically, defendant argues that the evidence shows that (1) at least an hour and a half passed between the shooting and the first statement and at least two hours between the shooting and the second statement; (2) Teresa was "coherent" and, therefore, calm while making those statements; (3) Teresa had had the opportunity to speak with a number of people, including her son, mother, and brother, before speaking with the officers; (4) Teresa's statements were not made spontaneously but rather in response to the officer's questioning; and (5) even if the court were to find that the first statement was spontaneous, that statement ruined any spontaneity for the second statement. The State in turn argues that none of these factors are dispositive on the issue of whether a statement is spontaneous and, in this case, the evidence shows that Teresa was still under the excitement of being shot when she made the statements.

¶ 70    The trial court in the instant case determined that Teresa's statements qualified as excited utterances, so our review is limited to whether that determination was an abuse of discretion. *People v. Cookson*, 215 Ill. 2d 194, 204 (2005). We find the trial court did not abuse its discretion when it found Teresa's first and second statements of identification satisfied the excited utterance exception to the Illinois hearsay rule.

¶ 71    The record shows that Teresa made her first statement to Officer Salinas approximately an hour and a half after she was shot in the face and while she was being treated in the emergency room trauma center for that gunshot wound. At the time of her statement, the bullet was still lodged in her head. Our supreme court has found that "[t]ime is one factor, albeit an elusive one, whose significance will vary with the facts of each case." *House*, 141 Ill. 2d at 382. "Indeed, the period of time that may pass without affecting the admissibility of a statement under the spontaneous declaration exception varies greatly." *Williams*, 193 Ill. 2d at 353. See, *e.g.*, *People v. Gacho*, 122 Ill. 2d 221 (1988) (statement made 6½ hours after the occurrence was admissible); *People v. Newell*, 135 Ill. App. 3d 417 (1985) (statement made 20 minutes after the occurrence was properly excluded). While the amount of time necessary for fabrication may vary greatly, the critical inquiry with regard to time is whether the statement was made while the declarant was still affected by the excitement of the event. *People v. Sutton*, 233 Ill. 2d 89, 107-08 (2009); *Williams*, 193 Ill. 2d at 353. Further, a declarant may make a spontaneous declaration to a person even after having spoken previously to another. *Lisle*, 376 Ill. App. 3d at 77-78; *House*, 141 Ill. 2d at 386. And, "[a]lthough a statement made in response to persistent interrogation might not be admitted under the spontaneous declaration exception [citation], the fact that a statement was made in response to a question does not necessarily destroy spontaneity." (Internal quotation marks omitted.) *Lisle*, 376 Ill. App. 3d at 77-78. No one factor is dispositive. *Williams*, 193 Ill. 2d at 353. We find that Teresa was still affected by the excitement of the shooting when she made the first statement to Officer Salinas. *Sutton*, 233 Ill. 2d at 107-08. As a result, we cannot say that the trial court abused its discretion when it found that an hour and a half did not ruin the spontaneity of Teresa's first statement.

¶ 72    Moreover, in *House*, our supreme court stated:
          "Even though the only testimony as to [the declarant's] condition at the time of her hospital statement was [the officer's] testimony that she appeared to be in pain, and even though [the officer] further testified she was alert and responsive, we believe it is

- 17 -

inconceivable that [the declarant] spent the intervening time attempting to reconstruct the details of her horrible experience, or fabricating a story to tell police. The very nature of her injuries was such that the injuries undoubtedly commanded her full attention." *House*, 141 Ill. 2d at 384.

Thus, just as in *House*, even though the only evidence of Teresa's condition in the record before us was that she appeared to be in a lot of pain yet was coherent and responsive, it seems unlikely that between the time she was shot and the time she made her first statement to Officer Salinas she was focusing on fabricating a story rather than focusing on getting the treatment she needed. See *id.* Therefore, considering the totality of the circumstances, we cannot say that the trial court abused its discretion in finding that Teresa's statement was admissible as an excited utterance. *Caffey*, 205 Ill. 2d 52 (this court will find an abuse of discretion only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person could take the view adopted by the trial court).

¶ 73    The second statement was given to Officer Riegler at approximately 2 a.m., only about 15 minutes after her first statement. When Officer Riegler spoke with Teresa, she was still in the emergency room trauma center, and her mother, brother, and son were present. Officer Riegler testified that Teresa appeared coherent and able to understand his questions. Officer Riegler asked her who shot her, and she named defendant. She then twice stated, "I can't believe Alvin shot me." The latter two statements were not made in response to any questioning. Not only was the second statement of identification made less than two hours after the shooting, but Teresa was still in the emergency room trauma center receiving treatment, and after identifying defendant as the shooter, she stated twice "I can't believe Alvin shot me." Based on this evidence, we believe there was sufficient evidence in the record to find that at the time of her second statement of identification, "the excitement of the event [still] predominated" (*Lisle*, 376 Ill. App. 3d at 78) such that we cannot say that the trial court's decision to admit this statement into evidence was arbitrary, fanciful, or unreasonable or that no reasonable person would have taken the same view. See *Illgen*, 145 Ill. 2d at 364.

¶ 74                        Excited Utterance and the Confrontation Clause

¶ 75    We have determined that the first two statements of identification made by Teresa qualified as excited utterances under Illinois hearsay rules. However, defendant argues the admission of these statements at trial violated his sixth amendment right to confront the witnesses against him.

¶ 76    Under the sixth amendment, a criminal defendant has the right to be confronted with the witnesses against him. U.S. Const., amend. VI. In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the Supreme Court held the confrontation clause prevents a "testimonial" hearsay statement of a declarant from being admitted against a criminal defendant, unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. In *Davis v. Washington*, 547 U.S. 813, 822 (2006), and its companion case, *Hammon v. Indiana*, 547 U.S. 813 (2006), the Supreme Court provided insight into what it meant by "testimonial" statements. The Court explained that a statement to law enforcement personnel will be deemed "nontestimonial" if the circumstances objectively indicate that the primary purpose of the interrogation is to gather information to meet an ongoing emergency. However, statements to law enforcement will be deemed "testimonial" if circumstances objectively indicate there is no ongoing emergency and the primary purpose of the interrogation is to

establish or prove past events to identify or convict the perpetrator. *Davis*, 547 U.S. at 822. In light of this distinction, the Court later explained:

> "[T]he statements at issue in *Davis* were nontestimonial and the statements in *Hammon* were testimonial. We distinguished the statements in *Davis* from the testimonial statements in *Crawford* on several grounds, including that the victim in *Davis* was 'speaking about events *as they were actually happening*, rather than "describ[ing] past events," ' that there was an ongoing emergency, that the 'elicited statements were necessary to be able to *resolve* the present emergency,' and that the statements were not formal. [Citation.] In *Hammon*, on the other hand, we held that, '[i]t is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct.' [Citation.] There was 'no emergency in progress.' [Citation.] The officer questioning Amy 'was not seeking to determine *** "what is happening," but rather "what happened." ' [Citation.] It was 'formal enough' that the police interrogated Amy in a room separate from her husband where, 'some time after the events described were over,' she 'deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed.' [Citation.] Because her statements 'were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation,' [citation], we held that they were testimonial." (Emphases in original.) *Michigan v. Bryant*, 562 U.S. 344, 356-57 (2011).

¶ 77    In holding that testimonial out-of-court statements may be admitted as evidence at trial only if the declarant testifies or the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant (*Crawford*, 541 U.S. at 53-54), the Court "overruled the longstanding reliability framework for the admissibility of out-of-court statements contained in *Ohio v. Roberts*, 448 U.S. 56 (1980)" (*People v. Thompson*, 349 Ill. App. 3d 587, 593 (2004)) and rendered the phrases "indicia of reliability" and "particularized guarantees of trustworthiness" irrelevant to confrontation clause rights (*Crawford*, 541 U.S. at 42, 60.

> "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Crawford*, 541 U.S. at 68.

Accordingly, whether the hearsay statement is testimonial is often the threshold issue under confrontation clause analysis. See *People v. Stechly*, 225 Ill. 2d 246, 279 (2007). Whether a statement is testimonial is a question of law, so that our review is *de novo. In re Rolandis G.*, 232 Ill. 2d 13, 23 (2008).

¶ 78    In order to resolve defendant's constitutional claims, we must first consider whether Teresa's first two statements of identification were testimonial. In this case, at the time police

- 19 -

were questioning Teresa, Teresa's son had identified defendant as the man who knocked at the door just prior to the shooting, defendant had already been arrested by Officer Salinas, and Teresa had been removed from the scene of the shooting and had been at the hospital for about an hour and a half. In addition, prior to questioning Teresa, the police had already collected evidence to build a case against defendant, which included a cursory search of his home. Based on those facts, we find that the primary purpose in questioning Teresa was not to determine if there was an ongoing emergency, since they already had defendant in custody for the shooting, but rather to establish or prove past events to identify or convict the perpetrator. *Davis*, 547 U.S. at 822; see also *Sutton*, 233 Ill. 2d at 107-08, 118-19 (although victim's statements in an ambulance were admissible as excited utterances, those excited utterances were still found to be testimonial). In *Sutton*, our supreme court found that statements given to a police officer while a victim was being transported from the scene of the crime to the hospital were testimonial in nature. *Sutton*, 233 Ill. 2d at 118-19. In so ruling, the court noted:

> "Although the offender was still at large when [the officer] questioned [the victim] in the ambulance, our review of the record indicates that [the officer's] interrogation was not directed at addressing an ongoing emergency. [The officer] testified that after speaking with [the victim] on the scene, he gave a dispatch to the surrounding towns to look for an offender involved in a shooting. [The officer] gave a description of a black male with dark hair and a mustache, 30 to 35 years old, wearing a dark jacket. At this point, a police unit from Lyons, Illinois, had arrived on the scene and approached [the second victim's] vehicle. Two ambulances arrived, and firefighters checked [the second victim] for a pulse. The area around [the second victim's] car was secured, and the license plate on [the second victim's] car was called in to the desk operator. At that point, [the victim] was placed into an ambulance." *Id.*

Here, defendant had been identified and taken into custody minutes after the shooting, well before any police officers spoke with Teresa to verify who had shot her. At the time Teresa gave her statements to police officers, she was surrounded by family members and hospital personnel. As such there was no ongoing emergency to address. The facts in this case are stronger than the facts in *Sutton* to support a finding that Teresa's statements to the police officers were testimonial.

¶ 79 The Supreme Court also held that testimonial statements found to be dying declarations or statements that fall under the doctrine of forfeiture by wrongdoing may be admitted as exceptions to the confrontation guarantee. *Giles*, 554 U.S. at 358 (declarations made by a speaker who was on the brink of death and aware that he was dying were admitted at common law even though they were unconfronted); *Davis*, 547 U.S. at 833 ("one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation"). However, we find no such exception exists for excited utterances, nor has the State pointed out any. Accordingly, Teresa's statements, although excited utterances, were testimonial, and defendant did not have the opportunity to cross-examine those statements as required under the confrontation clause. We have already determined that Teresa's statements did not satisfy the requirements for the dying declaration exception to the confrontation clause; therefore we will next consider whether her statements are admissible as an exception to the rule against hearsay under the doctrine of forfeiture by wrongdoing.

¶ 81    The doctrine of forfeiture by wrongdoing is a common-law doctrine. *Hanson*, 238 Ill. 2d at 96. "The common-law forfeiture rule was aimed at removing the otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them—in other words, it is grounded in the ability of courts to protect the integrity of their proceedings." (Internal quotation marks omitted.) *Giles*, 554 U.S. at 374. The common-law doctrine was codified at the federal level by Federal Rule of Evidence 804(b)(6) as an exception to the hearsay rule. Fed. R. Evid. 804(b)(6); *Davis*, 547 U.S. at 833; *Hanson*, 238 Ill. 2d at 97. In *Crawford*, the Supreme Court recognized that, in addition to serving as an exception to the hearsay rule, the doctrine also extinguishes confrontation clause claims on equitable grounds. *Crawford*, 541 U.S. at 62; *Davis*, 547 U.S. at 833 ("one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation"). In 2007, the Illinois Supreme Court recognized that the federal rule is coextensive with the common-law doctrine. *Hanson*, 238 Ill. 2d at 97 (citing *Stechly*, 225 Ill. 2d at 272-73). *Stechly* makes it clear that as applied in Illinois, the forfeiture-by-wrongdoing doctrine is coextensive with Federal Rule of Evidence 804(b)(6). *Stechly*, 225 Ill. 2d at 272-73. The Illinois Supreme Court has also recognized that the doctrine serves both as an exception to the hearsay rule and to extinguish confrontation clause claims. *Hanson*, 238 Ill. 2d at 97; *People v. Coleman*, 2014 IL App (5th) 110274, ¶ 133 ("The common law doctrine of forfeiture by wrongdoing provides a hearsay exception for statements made by an unavailable witness where the defendant intentionally made the witness unavailable in order to prevent him or her from testifying.").

¶ 82    More recently, the Illinois Supreme Court adopted the Illinois Rules of Evidence, which became effective on January 1, 2011. The Illinois Rules of Evidence codified the existing rules of evidence in this state, including the common-law doctrine of forfeiture by wrongdoing. Illinois Rule of Evidence 804(b)(5) (eff. Jan. 1, 2011) provides an exception to the rule against hearsay for "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." The reliability of the statement sought to be admitted is not an element of Illinois Rule of Evidence 804(b)(5). *People v. Peterson*, 2017 IL 120331, ¶ 33. When the State raises the doctrine of forfeiture by wrongdoing, it must prove both the wrongdoing and the intent to procure the unavailability of the declarant. Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011). The State's burden of proof is by a preponderance of the evidence. *Stechly*, 225 Ill. 2d at 278. "[W]hen a trial court makes a finding by a preponderance of the evidence, this court will reverse that finding only if it is against the manifest weight of the evidence. [Citation.] A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. [Citation.]" (Internal quotation marks omitted.) *Peterson*, 2017 IL 120331, ¶ 39.

¶ 83    The trial court admitted Teresa's third statement of identification to Detective El-Amin under the forfeiture-by-wrongdoing exception to the hearsay rule. The trial court initially found that Teresa's third statement was admissible under section 115-10.7 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.7 (West 2012)). Defendant argued the court should have applied section 115-10.6 of the Code, which requires the State to prove defendant intended to kill Teresa to prevent her from testifying at trial before her statements could be admitted under the common-law doctrine of forfeiture by wrongdoing. The State in turn argued that the trial court properly admitted Teresa's third statement, as well as her first and second

statements, based on the common-law forfeiture-by-wrongdoing doctrine and Illinois Rule of Evidence 804(b)(5) (eff. Jan. 1, 2011); it did not argue that the statements were properly admitted under the forfeiture-by-wrongdoing statute, either section 115-10.6 or 115-10.7 of the Code. 725 ILCS 5/115-10.6, 115-10.7 (West 2012).[1] We remanded for a determination, pursuant to Illinois Rule of Evidence 804(b)(5) (eff. Jan. 1, 2011), which codified the common-law doctrine of forfeiture by wrongdoing (*Perkins*, 2016 IL App (1st) 133981-U, ¶ 16), of whether the State proved by a preponderance of the evidence that defendant killed Teresa with the intent of procuring her unavailability as a witness (*id.* ¶ 19).

¶ 84    On remand, follow a hearing, the trial court found the State proved by a preponderance of the evidence that defendant shot Teresa with the intent to prevent her from testifying against him either for a violation of an order of protection or for criminal damage to property, and therefore "there was forfeiture by wrongdoing under common law." The State argues for the first time on appeal that Teresa's first and second statements could have also been admitted under the forfeiture-by-wrongdoing doctrine. The State failed to raise this argument in the trial court. Nonetheless, "[a]n appellee ' "may urge any point in support of the judgment on appeal, even though not directly ruled on by the trial court, so long as the factual basis for such point was before the trial court." [Citation.]' *Beahringer v. Page*, 204 Ill. 2d 363, 370, 789 N.E.2d 1216, 1222 (2003)." *People v. Rajagopal*, 381 Ill. App. 3d 326, 329 (2008). Therefore, we address all of Teresa's statements under the forfeiture-by-wrongdoing doctrine.

¶ 85    Because defendant withdrew his supplemental brief and moved to dispense with additional briefing, defendant has forfeited any challenge to the trial court's finding defendant killed Teresa to procure her unavailability as a witness. However, defendant argues the forfeiture-by-wrongdoing doctrine does not allow the introduction of Teresa's statements in this case because defendant "was not acting with the intent to prevent her from acting as a witness against him in *this* murder trial." (Emphasis in original.) Defendant argues the murder could not have been committed with the intent to make Iacovetti unavailable at defendant's murder trial because that trial "simply did not exist until after Iacovetti was actually killed." The State responds a defendant's intent to render a witness unavailable in one prosecution should be transferred to any related prosecutions. Defendant replies this court should "decline the State's invitation to so broadly expand the scope of forfeiture by wrongdoing."

¶ 86    In our supreme court's decision in *Peterson*, 2017 IL 120331, ¶ 14, the defendant argued that the trial court improperly admitted certain hearsay statements at his trial for the murder of his third ex-wife, Kathleen Savio. The challenged hearsay statements included statements by Kathleen. The State sought to admit Kathleen's statements (and the hearsay statements of the defendant's missing wife Stacy) under the common-law doctrine of forfeiture by wrongdoing. *Id.* ¶ 18. The case eventually proceeded to a jury trial in which the trial court admitted several hearsay statements by Kathleen and Stacy into evidence. *Id.* ¶ 24. On appeal to the supreme court, the defendant did not challenge the trial court's finding that the State proved by a preponderance of the evidence that he murdered Kathleen and Stacy. *Id.* ¶ 38. "Defendant [did] challenge the trial court's finding that the State established the 'intent factor,' *i.e.*, that the State proved by a preponderance that he murdered the two women to make them unavailable as witnesses." *Id.* Before Kathleen was killed, she and the defendant were in the middle of a divorce. "[T]he State's theory [was] that [the] defendant murdered Kathleen to prevent her

---

[1]The statutes have since been repealed.

from testifying at [a] hearing in the bifurcated divorce proceeding, at which issues of child custody, child support, maintenance, and division of property would be decided." *Id.* ¶ 45. Our supreme court found that "the inference that [the] defendant murdered Kathleen to prevent her from testifying is much stronger in this case, where a party to the litigation is murdered, than in a case where the person murdered had only a tangential relationship to the litigation or would have been, at most, a minor witness." *Id.* ¶ 46. The court held "[b]ased on our careful review of the evidence at the pretrial hearing, and mindful that the State's burden was a preponderance of the evidence, we cannot say that the trial court's finding that the State proved that defendant murdered Kathleen to prevent her from testifying was 'unreasonable, arbitrary, or not based on the evidence presented.' [Citation.]" *Id.* ¶ 51. "Turning to [the] defendant's intent as to Stacy, the State's theory [was] that [the] defendant murdered Stacy to prevent her from reporting to police [the] defendant's involvement in Kathleen's murder or testifying at a reasonably anticipated divorce hearing or a murder trial." *Id.* ¶ 52. The defendant argued the State failed to meet its burden of proof as to his intent based, in part, on the fact that no civil or criminal proceeding was pending at the time of Stacy's murder. *Id.* The *Peterson* court was guided by the United States Supreme Court's decision in *Giles*, in which the Court "expressly contemplated that the forfeiture doctrine could apply not only where the defendant's efforts were designed to prevent testimony at trial, but also where the defendant's efforts were designed to prevent testimony to police, *i.e.*, reporting criminal conduct." *Id.* ¶¶ 53-54 (citing *Giles*, 554 U.S. at 377). The *Peterson* court found there was "no error in the admission of Kathleen's and Stacy's hearsay statements at trial pursuant to the doctrine of forfeiture by wrongdoing." *Id.* ¶ 76.

¶ 87    Defendant's argument in this case that the "central feature" of the common-law forfeiture-by-wrongdoing doctrine is that it requires "the defendant to have acted to preclude a witness from testifying against him in the trial in which the statements are offered" (emphasis omitted) lacks merit. In *Peterson*, our supreme court held that when it "codified the common-law doctrine of forfeiture by wrongdoing in Illinois Rule of Evidence 804(b)(5), [it] did not condition the doctrine's application on the existence of a pending legal proceeding." *Id.* ¶ 56. Moreover, the defendant in *Peterson* acted to preclude the declarant from testifying in a divorce proceeding, and the statements were properly admitted in the defendant's trial for the declarant's murder. Just as in this case, the defendant in *Peterson* murdered the declarant to procure her unavailability as a witness in other than the proceeding on the declarant's murder, and our supreme court found "no error in the admission" of those statements in the defendant's trial for the declarant's murder "pursuant to the doctrine of forfeiture by wrongdoing" (*id.* ¶ 76). Accordingly, where the State proved by a preponderance of the evidence defendant killed Teresa to procure her unavailability as a witness, we find no error in the admission of Teresa's statements in defendant's trial for her murder. Additionally, nowhere in the *Peterson* decision did our supreme court state that its application of the common-law forfeiture-by-wrongdoing doctrine was a departure from or an expansion of its original scope. Rather, the decision in *Peterson* implies only that the court was applying the doctrine as originally intended. See *Giles*, 554 U.S. at 379 (Souter, J., specially concurring in part, joined by Ginsburg, J.) ("It was, and is, reasonable to place the risk of untruth in an unconfronted, out-of-court statement on a defendant who meant to preclude the testing that confrontation provides. The importance of that intent in assessing the fairness of placing the risk on the defendant is most obvious *when a defendant is prosecuted for the very act that causes the*

*witness's absence*, homicide being the extreme example." (Emphasis added.)); see also Colin Miller, *The Purpose-Driven Rule: Drew Peterson,* Giles v. California*, and the Transferred Intent Doctrine of Forfeiture by Wrongdoing*, 112 Colum. L. Rev. Sidebar 228, 230-31 (2012) (discussing *Giles*).[2]

Because the forfeiture-by-wrongdoing doctrine is both an exception to the hearsay rule and extinguishes confrontation clause claims on equitable grounds (*Crawford*, 541 U.S. at 62; *Davis*, 547 U.S. at 833), we hold the trial court properly admitted all three of Teresa's statements under the forfeiture-by-wrongdoing doctrine and there was no violation of defendant's sixth amendment right to confront witnesses.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

---

[2]"This essay contends, however, that Justice Scalia's plurality opinion and the concurring opinion of Justices Souter and Ginsburg in fact endorsed a transferred intent doctrine of forfeiture by wrongdoing. First, by making the operation of the doctrine dependent upon causation and intent rather than causation and benefit, the Court allowed for transferred intent principles to apply in the forfeiture context. Second, by analogizing the doctrine to the coconspirator admission rule, the Court impliedly recognized that forfeiture is based upon principles that extend beyond a single trial. Third, by determining that the purpose of the doctrine is protecting the integrity of the trial system, the Court allowed an analogy to be drawn between forfeiture and the crime-fraud exception to the attorney-client privilege, which also exceeds the bounds of a single trial." (Emphases omitted.) Miller, *supra*, at 230-31.